In re MEYER-MIDWAY, INC., Debtor.

Jay A. STEINBERG, Trustee of the Estate of Meyer-Midway, Inc., Plaintiff,

v.

AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Defendant.

Bankruptcy Nos. 80 B 07348, 82 A 2446.

United States Bankruptcy Court,
N.D. Illinois, E.D.

Aug. 7, 1986.

Edward W. Rothe, James T. Malysiak, Freeman, Rothe, Freeman & Salzman, P.C., Chicago, Ill. for trustee.

Narcisse A. Brown, Ira S. Kolb, David N. Missner, Schwartz Cooper, Kolb & Gaynor, Chtd., Chicago, Ill. for defendant Bank.

## MEMORANDUM OPINION AND ORDER

EDWARD B. TOLES, Bankruptcy Judge.

This matter came before the court on cross-motions for summary judgment with respect to Count I of the TRUSTEE's Complaint to avoid preferential transfers and the AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO'S ("BANK") motion to strike and dismiss Counts I through IV of the Complaint. The TRUSTEE appeared by counsel, EDWARD W. ROTHE. The defendant BANK appeared by counsel, DAVID N. MISSNER, of the firm of SCHWARTZ, COOPER, KOLB & GAYNOR CHARTERED.

## THE ISSUES

This case essentially involves the interpretation of § 9–402(7) of the Uniform Commercial Code ("U.C.C."). Ill.Rev.Stat. ch. 26, § 9–402(7) (Smith-Hurd 1984). The rights and powers of the TRUSTEE to avoid transfers under either the "strong arm clause" of 11 U.S.C. § 544 or as preferential and fraudulent transfers under 11 U.S.C. §§ 547 and 548 depend on whether the BANK is found to have a perfected security interest in the accounts receivable of the debtor, MEYER–MIDWAY, INC.

## THE FACTS

J. Meyer & Co., an Illinois corporation ("Meyer") and the Midway Tobacco Co., an Illinois corporation ("Midway") began operating from the same premises in Wheeling, Illinois in January, 1979 after a fire destroyed the Midway property. On September 27, 1979, a memorandum of agreement was signed between the two companies providing that Meyer and Midway would merge by the pooling of interests method. The memorandum called for the two companies to operate as a joint venture effective October 1, 1979 until the merger became effective.

Meyer and Midway needed financing and worked with the BANK on a loan which all the parties contemplated would not be made until the merger was completed. Delays in consummating the merger however, made it necessary for the loan to be funded immediately. Therefore, in November, 1979, the BANK made a 2.5 million dollar revolving loan ("Joint Loan") jointly to Meyer and Midway. The loan advances were secured by separate security interests in Meyer's and Midway's accounts receivable. On November 13, 1979, the BANK perfected its security interests in the ac-

counts receivable by filing separate financing statements for Meyer and Midway with the Illinois Secretary of State.

On April 16, 1980, Meyer and Midway merged to form MEYER–MIDWAY, INC., a Delaware corporation ("MEYER–MIDWAY"). The following day, April 17, 1980, MEYER–MIDWAY executed a security agreement granting the BANK a security interest in MEYER–MIDWAY's accounts receivable and proceeds including after-acquired property.

On April 24, 1980, the BANK funded the MEYER–MIDWAY revolving loan. The Joint Loan of Meyer and Midway was redocumented to properly reflect the merger and the MEYER–MIDWAY name. In doing so, the BANK made a book entry of a draw down on the ledger, thereby showing an outstanding loan to MEYER–MIDWAY, and simultaneously marked the Joint Loan to Meyer and Midway as paid. No money was paid in connection with these bookkeeping entries.

The BANK obtained the signatures of the Vice President of both Meyer and Midway on amendments to the November 13, 1979 financing statements and on May 5, 1980, filed the separate amendments to the Meyer and Midway financing statements "to show name change." The BANK did not file a financing statement with respect to the new April 17, 1980 security agreement pledging MEYER–MIDWAY's receivables as collateral for the MEYER–MIDWAY loan.

On Wednesday, May 28, 1980, the principals of the corporation met with an officer of the BANK and informed the BANK they intended to go out of business and to make an assignment for the benefit of creditors. The BANK advanced no further funds on the account after that date and drained the funds from MEYER–MIDWAY's checking account the following day.

The assignment for the benefit of creditors was actually made on Monday, June 2, 1980. On June 13, 1980, an involuntary petition was filed against MEYER–MIDWAY and an order for relief was entered on July 23, 1980.

The BANK continued to collect the accounts receivable after MEYER–MIDWAY closed its doors on Friday, May 30, 1980. The principal balance of the MEYER–MIDWAY loan was $1,571,341.76 on that date. That amount, together with $117,738.25 interest, was fully repaid by June 24, 1980, through the BANK's collection of the MEYER–MIDWAY accounts receivable. This Court entered an order on June 20, 1980, approving the BANK's continued collection of MEYER–MIDWAY's accounts receivable and allowing the application of the proceeds to repay the loan, with any surplus to be turned over with interest to the TRUSTEE. The order was without prejudice to the right of the TRUSTEE to contest the BANK's priority status.

On July 2, 1982, the TRUSTEE filed this adversary proceeding against the BANK claiming: Count I: MEYER–MIDWAY's accounts receivable collections received by the BANK and applied on the MEYER–MIDWAY revolving loan after April 24, 1980, totalling $2,543,647.84, constituted preferential transfers voidable by the TRUSTEE under 11 U.S.C. § 547; Count II: The conversion (through sales) of approximately $1 million dollars worth of unsecured inventory into alleged secured accounts receivable after May 28, 1980 (the time when the BANK learned MEYER–MIDWAY intended to make an assignment for the benefit of creditors) constituted voidable preferential or fraudulent transfers under 11 U.S.C. §§ 547, 548; Count III: The TRUSTEE, under 11 U.S.C. § 544 has priority over the BANK under the "strong arm clause" as to all MEYER–MIDWAY receivables collected after the filing of the involuntary petition on June 13, 1980; and Count IV: The BANK violated its fiduciary duty to MEYER–MIDWAY in collecting and accounting for MEYER–MIDWAY's accounts receivable.

In lieu of an answer the BANK moved to strike and dismiss all four counts of the TRUSTEE's Complaint for failure to state a claim upon which relief could be granted and alternatively moved for summary judgment on Count I. The TRUSTEE resisted

the motions and then cross-moved for summary judgment on Count I after the briefs revealed that there was no dispute as to any material fact and that summary judgment could be entered as a matter of law.

## THE CROSS-MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate only when there are no genuine issues of material fact. Fed.R.Civ.P. 56(c); *Hermes v. Hein,* 742 F.2d 350 (7th Cir.1984). After an exchange of briefs, the BANK and the TRUSTEE agreed the material facts were undisputed and each party felt that the facts as presented would support summary judgment in their favor.

The Court will address the summary judgment motions before considering the BANK's Motion to Strike or Dismiss the other counts of the Complaint.

## THE TRUSTEE'S POWERS

The Bankruptcy Code empowers the TRUSTEE to avoid certain transfers of the debtor's interest in property if they are fraudulent and preferential transfers. Additionally, under the "strong arm clause" the TRUSTEE may assert the priority of a hypothetical lien creditor over any other lienholder who is not properly perfected at the commencement of the case.

It is these rights which the TRUSTEE claims entitle him to recover, for the benefit of the estate, the accounts receivable collected by the BANK after April 24, 1980, the day the BANK funded the loan to MEYER–MIDWAY. The TRUSTEE may assert these rights if it is determined that the BANK's security interest in MEYER–MIDWAY's accounts receivable was not properly perfected.

## THE BANK'S REDOCUMENTATION OF THE JOINT LOAN

The TRUSTEE admits that the BANK had a first and valid lien on the accounts receivable of Meyer and Midway. He contends, however, that the BANK lost its security interest on April 24, 1980 when the remaining accounts receivable were transferred to MEYER–MIDWAY in the merger and the BANK's loan to those two companies was paid off. The TRUSTEE submits that the BANK's failure to file a financing statement naming MEYER–MIDWAY as the debtor, signed by MEYER–MIDWAY, and identifying the MEYER–MIDWAY receivables as collateral for the MEYER–MIDWAY loan results in the BANK's unperfected security interest being subordinate to the TRUSTEE's rights. 11 U.S.C. § 544; U.C.C. § 9–301(1)(b) and (3).

The parties have spent pages of their briefs arguing whether the Joint Loan was "paid off" and whether a "new loan" was granted. They have focused on the entries on ledger cards and the notations on the original note. The courts have frequently considered the redocumentation of loans of this type and have looked at the substance of the transaction rather than its form. *Whirlpool Corp. v. Bank of Naperville,* 97 Ill.App.3d 139, 52 Ill.Dec. 215, 421 N.E.2d 1078 (1981). In *Whirlpool,* the court stated that "the fact that the Bank required a new agreement from the debtor ... and furnished fresh consideration is not dispositive. Merely taking the new note even with an advance of additional cash did not extinguish the old obligation which was the basis of the Bank's 1973–74 security interest where ... the new note was given in renewal and not in payment." 97 Ill. App.3d at 142, 52 Ill.Dec. at 217, 421 N.E.2d at 1080. This Court is of the opinion that the paper changes in the redocumentation of the MEYER–MIDWAY loan are of the type routinely done in banks and are simply changes in form rather than substance. Whatever notations were used in the redocumentation, the Court believes the Joint Loan was not really "paid off," but rather bookkeeping entries were made which were necessary to reflect the consequences of the merger. These entries had no effect on the BANK's existing security interest in the Meyer and Midway accounts receivable.

## THE APPLICATION OF U.C.C. § 9–402(7)

The parties have focused their attention on the effect the merger of Meyer and

Midway had on the BANK's perfected security interest in the accounts receivable of those two companies. This emphasis is proper because under U.C.C. § 9–402(7) the characterization of the MEYER–MIDWAY merger determines whether the Meyer and Midway financing statements will continue to be effective for purposes of perfecting the BANK's security interest in the debtor's accounts receivable.

The BANK in its effort to minimize the differences between MEYER–MIDWAY and its constituent corporations has cited Delaware General Corporation Law which provides that upon a merger, the constituent corporations have their identity absorbed into that of the corporation into which they are merged. *Argenbright v. Phoenix Finance Co.*, 21 Del.Ch. 288, 187 A. 124, 126 (1936). On the other hand, the TRUSTEE in his attempt to show how different MEYER–MIDWAY is from its constituent corporations has cited the approach used by the Internal Revenue Service to determine whether a corporation which has a change in "identity, form or place of organization" has undergone a mere change in form rather than one of substance and therefore, will qualify as a tax-free corporate reorganization. 26 U.S.C. § 368(a)(1)(F). While the Court finds the comparisons of interest, the Court does not believe it is necessary to go beyond a careful consideration of U.C.C. ¶ 9–402(7) to resolve the issue at hand. This subsection which was added by the .972 amendments provides:

> (7) A financing statement sufficiently shows the name of the debtor if it gives the individual, partnership or corporate name of the debtor, whether or not it adds other trade names or names of partners. Where the debtor so changes his name or in the case of an organization its name, identity or corporate structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than 4 months after the change, unless a new appropriate financing statement is filed before the expiration of that time.

A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer.

The Uniform Commercial Code operates under the concept of "notice filing," thus financing statements which contain non-misleading errors are still effective. U.C.C. § 9–402(8). A financing statement which substantially complies with the requirements of § 9–402 will satisfy the Code's "notice" scheme by providing notice that "the secured party who has filed may have a security interest in the collateral described." U.C.C. § 9–402, Comment 2 (1962 version).

The 1962 version of Article Nine did not address the effect a post-perfection change in the debtor's name or a transfer by the debtor of the secured party's collateral would have on a creditor's security interest. In that situation, a creditor searching the records under the debtor's new name or the name of the entity to which the collateral had been transferred would not be put on notice of the previously filed financing statement which complied with all the Code requirements necessary for perfection at the time it was filed.

Although § 9–402(7) was intended as the simple rule to address the problem described above, the courts and commentators have parsed the subsection and have reached many different interpretations. *E.g., In re Taylorville Eisner Agency, Inc.*, 445 F.Supp. 665 (S.D.Ill.1977); *Citizens Savings Bank v. Sac City State Bank*, 315 N.W.2d 20 (Iowa 1982); R. Anderson, Anderson on the Uniform Commercial Code § 9–402:56 (3d ed. 1985); Burke, *The Duty to Refile Under Section 9–402(7) of the Revised Article 9*, 35 Bus.Law. 1083 (1980); Westbrook, *Glitch: Section 9–402(7) and the U.C.C. Revision Process*, 52 Geo.Wash.L.Rev. 408 (1984). Generally, the Courts and commentators agree that the refiling issue addressed by § 9–402(7) can arise in two different contexts. Thus, the section has been applied when the debt-

442

or has simply undergone a "name change" and when there has been a "transfer of collateral" by the debtor to a successor enterprise. *See* Note, *Debtors' Name or Identity Changes: Distributing Benefits and Burdens under Article 9*, 31 Hast.L.J. 959 (1980).

### THE "NAME CHANGE" CASE

Under the second sentence of § 9–402(7) in order for the secured creditor to remain perfected in collateral acquired by the debtor more than four months after there has been a change in the "name, identity or corporate structure" of the debtor, the secured creditor must refile his financing statement, but only if the debtor's change in "name, identity or corporate structure" has rendered the previously filed financing statement "seriously misleading." If the debtor's post-perfection change does not make the existing filing misleading, the creditor need not refile to continue its secured status. The BANK argues that the application of this sentence requires the conclusion that the BANK remained perfected in the accounts receivable after the MEYER-MIDWAY merger because the name change would not be "seriously misleading" since MEYER-MIDWAY was alphabetically in line with the names Meyer and Midway.

■ "The purpose of the financing statement is to put third parties on notice that a security interest may exist in certain property and that they should contact the parties to obtain details." *In re Little Brick Shirthouse, Inc.*, 347 F.Supp. 827, 829 (N.D.Ill.1972). Whether a filed financing statement is "seriously misleading" and therefore, not effective to perfect the creditor's security interest in the collateral must be determined by the facts in each case. Some courts have ignored irregularities in names as immaterial and therefore, not misleading. *In re Excel Stores, Inc.*, 341 F.2d 961 (2nd Cir.1965) ("Excel Department Stores" rather than "Excel Stores, Inc."); *E.g., In re Platt*, 257 F.Supp. 478 (E.D.Pa. 1966) ("Platt Fur Co." rather than "Henry Platt").

■ Other courts, however, have not taken this liberal view. Thus, a filing which was in the name of the individuals who were the principals of the corporate debtor was found to be misleading even though the corporate name began with the individuals' last name and the community was small so that it was unlikely anyone could be misled. *In re Lintz West Side Lumber, Inc.*, 655 F.2d 786 (7th Cir.1981); *Whirlpool Corp. v. Bank of Naperville*, 97 Ill.App.3d 139, 52 Ill.Dec. 215, 421 N.E.2d 1078 (1981) ("Carpet Castle" rather than "Carpet Castle, Inc."); *First Agri Services, Inc. v. Kahl*, 129 Wis.2d 494, 385 N.W.2d 191 (App.1986) ("Gary and Dale Kahl" rather than "Kahl Farms"). Since the courts in the Seventh Circuit are tending to find that financing statements with irregularities are misleading, this Court is of the opinion that a filing in the names of Meyer and Midway would be "seriously misleading".

Under § 9–402(7) the secured creditor remains perfected in collateral acquired by the debtor for four months after the change in "name, identity or corporate structure" even if the change renders the filed financing statement "seriously misleading." The BANK submits that since the bankruptcy petition was filed during the four month grace period provided by U.C.C. § 9–402(7), the BANK was perfected in the MEYER-MIDWAY accounts receivable at the commencement of the case.

■ During the four month grace period, the secured party may file a new appropriate financing statement which will continue the effectiveness of the earlier filed financing statement. A "new appropriate financing statement" may be either a new financing statement or an amendment to the earlier filed financing statement. U.C.C. § 9–402(4). It is not clear why the BANK, after obtaining a new security agreement, did not file a new financing statement naming MEYER-MIDWAY as the debtor. However, on May 5, 1980, the BANK filed amendments to the Meyer and Midway financing statements to show the name change. The Court finds these

amendments were sufficient to meet the requirement of a new appropriate financing statement which continued the effectiveness of the previous filing.

### THE "TRANSFER OF COLLATERAL" CASE

The third sentence of § 9–402(7) must be read in connection with the second sentence of that section. While the second sentence requires a refiling as to *new* collateral acquired more than four months after the "misleading" change, the third sentence states what is obvious from the second sentence. The secured creditor need not refile with respect to the *specific collateral transferred* by the debtor to a successor enterprise.

By reason of an incorporation, merger or transfer of encumbered assets to a related corporation, the debtor has undergone more than a "name change." *In re Sofa Centre, Inc.,* 18 U.C.C.Rep.Serv. 536 (Bankr.M.D.Fla.1975) (incorporation); *Inter Mountain Ass'n of Credit Mem. v. Villager, Inc.,* 527 P.2d 664 (Utah 1974) (merger); *In re Kittyhawk Television Corp.,* 516 F.2d 24 (6th Cir.1975) (transfer of encumbered assets to related corporation). These changes which result in the successor enterprise having the same ownership or control as the original debtor have been called "identity transfers." Note, 31 Hast.L.J. at 975. They are the changes in "identity" or "corporate structure" to which the second sentence of § 9–402(7) speaks.

█ Like a change in the debtor's name which renders the previous filing misleading and ineffective to put potential secured creditors on notice of a prior security interest, a transfer of collateral by the debtor to a successor entity with a different name will also result in the financing statement failing in its notice function. Thus, even in a "transfer of collateral" or "identity transfer" case, the secured creditor who wishes to remain perfected in *new* collateral acquired by the debtor after the four month grace period has elapsed will need to satisfy the requirements of the second sentence

of § 9–402(7) by filing a new appropriate financing statement.

The Meyer and Midway change in "identity" or "corporate structure" not only resulted in the financing statements becoming misleading, but also in the collateral being transferred to the successor entity, MEYER-MIDWAY. Thus, the secured creditor in this situation must look at both the second and third sentences of § 9–402(7) to see what refiling obligations are imposed upon the BANK. This interpretation of § 9–402(7) is buttressed by the Uniform Commercial Code Comments to subsection 7 which state:

7. ... "Subsection (7) also deals with the case of a change of name of a debtor and provides some guidelines when mergers or other changes of corporate structure of the debtor occur with the result that a filed financing statement might become seriously misleading."

8. "Subsection (7) also deals with a different problem, namely whether a new filing is necessary where the collateral has been transferred from one debtor to another.... This Article now answers the question in the negative.

Since the second sentence of § 9–402(7) gives all secured creditors, irrespective of the type of security they hold, a period of four months in which no new filing is necessary to maintain their secured status, the secured creditor has no refiling obligation during that time. The third sentence tells the secured creditor that once the four months have elapsed there still is no refiling requirement in order to remain perfected in the *specific collateral transferred* by the debtor. *First Agri Services, Inc. v. Kahl,* 129 Wis.2d 464, 385 N.W.2d 191 (App.1986).

The TRUSTEE argues that the MEYER-MIDWAY merger should be analyzed as a "transfer of collateral" case. Any receivables generated after the merger, according to the TRUSTEE, could not have been collateral *transferred* by Meyer and Midway because they were not in existence at the

time of the merger. *Citizens Savings Bank v. Sac City State Bank,* 315 N.W.2d 20, 25 (Iowa 1982); *see* Burke, 35 Bus.Law. at 1100. The TRUSTEE contends that the BANK should have refiled a financing statement to be perfected in accounts receivable generated after the merger.

■ The Court agrees with the TRUSTEE that the BANK would be obligated to file a revised financing statement to be perfected in *new* collateral or collateral intended to secure the BANK under the after-acquired property clause. The refiling obligation does not arise however, until the end of the four month grace period. This Court is declining to follow *In re Taylorville Eisner Agency, Inc.,* 445 F.Supp. 665 (S.D.Ill.1977) which held that "collateral transferred by the debtor" is all the property subject to the security interest, including all after-acquired property. To do so would "infect" with perfection, under a financing statement listing the transferor as the debtor, any property later acquired by the successor entity. *First Agri Services, Inc. v. Kahl,* 129 Wis.2d 464, 385 N.W.2d 191, 193–94 n. 5 (App.1986).

## IS MEYER-MIDWAY A "NAME CHANGE" OR A "TRANSFER OF COLLATERAL" CASE?

■ After the merger, MEYER-MIDWAY had the same ownership and control as did the original debtors Meyer and Midway. The change in identity or corporate structure through the use of a merger has resulted in a transfer of collateral by the two debtors to the successor enterprise MEYER-MIDWAY. Thus, the Court concludes that in this "transfer of collateral" case, after the four month grace period expired, no new financing statement would be required for the BANK to remain perfected in the accounts receivable which were in existence at the time of the merger and which were *transferred* to MEYER-MIDWAY. As to the accounts receivable which constituted *new* collateral under the BANK's after acquired property clause, a new filing would be required for any accounts receivable generated more than four months after the merger. Thus the BANK has overcome the TRUSTEE's challenges to its security interest by filing "a new appropriate financing statement" within the four month grace period.

■ The relationship between the third sentence of § 9–402(7) and § 9–306(2) deserves comment. Under § 9–306(2) a security interest continues in collateral upon its disposition by the debtor unless the secured creditor authorized the disposition. Under § 9–402(7), the secured creditor need not refile a financing statement with respect to any collateral transferred by the debtor whether the secured creditor knows of or consents to the transfer.

Although it might be argued that the BANK knew of the transfer of collateral to MEYER-MIDWAY and that knowledge is tantamount to authorizing the transfer, the Court believes that § 9–306 should not be applied when the transfer is an "identity transfer" as described above. The status of a security interest after an identity or organizational change in the debtor is covered specifically in § 9–402(7). The Court believes the application of § 9–306 should be reserved for a transfer of collateral to an unrelated entity which does not have the same ownership or control as the original debtor. *See* Note, 31 Hast.L.J. at 988–991; *contra* Burke, 35 Bus.Law. at 1088, 1089.

The TRUSTEE has argued that because the BANK knew of the merger prior to loaning the funds to Meyer and Midway, that it breached its duty of good faith under U.C.C. § 9–203 by not filing a financing statement in the name of MEYER-MIDWAY. The Court is not persuaded by this argument. The BANK continued its perfected security interest in the MEYER-MIDWAY accounts receivable in a manner authorized by § 9–402(4).

The Court holds that the BANK was properly perfected in all accounts receivable of the debtor MEYER-MIDWAY at the commencement of the bankruptcy case. Nevertheless, the Court is unable to grant summary judgment in favor of the BANK for the reasons stated below.

## THE BANK'S AFTER-ACQUIRED PROPERTY CLAUSE

Under U.C.C. § 9–108 a security interest in after-acquired collateral shall be deemed to be taken for new value and not as security for an antecedent debt if the debtor acquires his rights in such collateral in the ordinary course of business. U.C.C. § 9–108 provides:

Where a secured party makes an advance, incurs an obligation, releases a perfected security interest, or otherwise gives new value which is to be secured in whole or in part by after-acquired property his security interest in the after-acquired collateral shall be deemed to be taken for new value and not as security for an antecedent debt if the debtor acquires his rights in such collateral either in the ordinary course of his business or under a contract of purchase made pursuant to the security agreement within a reasonable time after new value is given.

■ The TRUSTEE has alleged that the BANK, which did not have a security interest in the debtor's inventory, allowed the debtor to convert unsecured inventory into secured accounts receivable prior to the closing of the business. If the debtor did not acquire his rights in the accounts receivable in the ordinary course of business, then the after-acquired collateral is deemed to be taken as security for an antecedent debt and thus, subject to the TRUSTEE's preference claim. A factual hearing will be required to determine whether the accounts receivable were generated in the debtor's ordinary course of business.

## THE "IMPROVEMENT IN POSITION" TEST

■ Under 11 U.S.C. § 547(c)(5) a creditor holding a perfected security interest through a "floating lien" on the debtor's inventory or receivables will not be considered to have received a preference except to the extent that the creditor has improved his position during the preference period. That section provides as follows:

(c) The trustee may not avoid under this section a transfer—

(5) that creates a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee caused a reduction, as of the date of the filing of the petition and to the prejudice of other creditors holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of all security interests of such debt on the later of—

(A)(i) with respect to a transfer to which subsection (b)(4)(A) of this section applies, 90 days before the date of the filing of the petition; or

(ii) with respect to a transfer to which subsection (b)(4)(B) of this section applies, one year before the date of the filing of the petition; or

(B) the date on which new value was first given under the security agreement creating such security interest;

11 U.S.C. § 547(c)(5).

To determine whether the BANK has improved its position to the prejudice of unsecured creditors, a financial accounting will need to be presented to the Court.

## THE BANK'S MOTION TO STRIKE OR DISMISS

The BANK moves to strike or dismiss Counts II, III and IV of the TRUSTEE's Complaint on the ground that they fail to state causes of action upon which relief can be granted under Fed.R.Civ.P. 12(b)(6). The BANK contends that the Counts fail to allege sufficiently detailed facts to support the claims made.

A motion to strike under Fed.R.Civ.P. 12(f) is designed to remove any insufficient defense or any redundant, immaterial, impertinent or scandalous matter in any pleading. The TRUSTEE's Complaint does not contain any matter of this type, therefore, the motion to strike will be denied.

Under the standard governing Rule 12(b)(6), "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can

prove no set of facts in support of this claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The Complaint in Counts II and IV allege sufficient facts to support a claim for relief. Therefore, the motion to dismiss Counts II and IV is denied. The Court does not believe that Count III contains any facts which could create issues to be resolved by trial but rather that the order which the TRUSTEE seeks in Count III is unnecessary because the TRUSTEE is vested with those rights and powers by virtue of 11 U.S.C. § 544.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that both motions for summary judgment are denied, that the BANK's motion to dismiss with respect to Count III is granted, and that the TRUSTEE is given leave to amend his complaint within thirty (30) days to make a more definite statement of his claims for relief in accordance with this opinion.