942 F.2d 381
 Bankr. L. Rep. P 74,202, 15 UCC Rep.Serv.2d 369
In re BLUEGRASS FORD-MERCURY, INC., Debtor,
BLUEGRASS FORD-MERCURY, INC., Plaintiff-Appellee,
v.
FARMERS NATIONAL BANK OF CYNTHIANA, Defendant-Appellant.
 No. 90-6121.
 United States Court of Appeals,
Sixth Circuit.
 Submitted May 20, 1991.
Decided Aug. 20, 1991.
 
 Barry M. Miller, Taft McKinstry, Fowler, Measle & Bell, Lexington, Ky., for plaintiff-appellee.
 Joseph M. Scott, Jr., Laura Day Carruthers, Stoll, Keenon & Park, Lexington, Ky., for defendant-appellant.
 Before GUY and RYAN, Circuit Judges, and JOINER, Senior District Judge.*
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Defendant, Farmers National Bank of Cynthiana (Farmers), appeals the district court's decision, which affirmed the bankruptcy court's order, setting aside certain liens held on Bluegrass Ford-Mercury's (Bluegrass or debtor) property as preferential and allowing Bluegrass to recover certain payments made during the preference period from the bank.
 
 
 2
 Farmers argues that it was a perfected, secured creditor and, thus, did not receive any preferential transfers. Additionally, Farmers argues that the plaintiff has failed to prove all of the essential elements of a preferential transfer. Finally, Farmers argues that the exceptions to the rule against preferential transfers, as provided in 11 U.S.C. § 547(c), should apply and therefore Bluegrass is not entitled to avoid the payments made to Farmers. We find defendant's arguments without merit and affirm, essentially on the basis of the bankruptcy and district court opinions, although our rationale differs slightly from both the bankruptcy and district courts.
 
 I.
 
 3
 Farmers entered into a floor plan financing arrangement with Bluegrass Ford, Bluegrass Ford-Mercury's predecessor, in the mid-1970s.
 
 
 4
 "Floor planning is a form of inventory financing." Ruda, Floor Planning, Commercial Finance, Factoring, and Other Asset-Based Lending 1984, 339 PLI/Comm. 135, 135 (1984) (hereinafter Floor Planning). It provides a means of "lending to a dealer against the security of its automobile inventory." Id. Generally, "[t]he borrower is a seller or lessor of personal property...." d "[t]he lender may be a bank or finance company." Id.
 
 
 5
 As new vehicles were shipped to Bluegrass Ford, it would forward a draft for payment to the bank. A representative of the dealership would go to the bank upon its receipt of these drafts and execute a 90-day "Precomputed Installment Note, Disclosure & Security Agreement." Once these notes were executed, the bank would pay the drafts directly to the Ford Motor Company. The notes covered one or more cars, depending on the number of drafts. As the vehicles were sold, the principal amount of the note was paid to the bank. Upon the sale of the last vehicle covered under the agreement, or when the 90-day period had expired and the agreement was up for renewal, the interest was paid.
 
 
 6
 To perfect its security interest in the proceeds from the sales of the automobiles, Farmers filed a Uniform Commercial Code (UCC) financing statement on June 7, 1977. This financing statement covered "all new cars and demonstrators in the inventory of Bluegrass Ford, Inc." Although new floor plan notes were executed, no new financing statements were filed.
 
 
 7
 In August of 1979, the assets of the dealership were sold by William A. Webber to James A. Morris. These assets included all new cars in Bluegrass Ford's inventory. As part of the same sales contract, Bluegrass Ford conveyed its real property to James A. Morris and his wife, Betty C. Morris.
 
 
 8
 After the sale, the dealership was transferred to a new corporate entity called Bluegrass Ford-Mercury, Inc., the plaintiff in this action. James Morris executed new notes and security agreements with the bank in order to assume the indebtedness of the old dealership. The floor plan financing arrangement continued as before, until just before Bluegrass Ford-Mercury filed its petition for relief. No new financing statement to perfect Farmers' security interest in Bluegrass Ford-Mercury's inventory was filed as a result of the change in ownership or corporate name of the dealership.
 
 
 9
 In the spring of 1981, Bluegrass developed financial problems and stopped paying proceeds from sold vehicles to the bank. In total, the amount of income realized by Bluegrass Ford-Mercury from vehicles sold out of trust[1] was $160,220.39.
 
 
 10
 On April 9, 1981, Bluegrass Ford-Mercury, Inc., owed Farmers $232,084.24 on floor plan vehicles that were subject to installment notes. This includes the proceeds owed for the sales of vehicles out of trust.
 
 
 11
 In an effort to solve its problems, Bluegrass Ford-Mercury, on April 9, 1981, obtained a loan in the principal amount of $250,000 from Farmers National Bank. The Small Business Administration (SBA) guaranteed this loan. The proceeds of this loan were deposited into Bluegrass Ford-Mercury's account at Farmers. A note for this amount, payable to the bank, was executed by Bluegrass Ford-Mercury. A security agreement was simultaneously executed and filed as a financing statement. This agreement is dated March 27, 1981. The security agreement stated that it was given to secure the $250,000 loan and listed specific types of collateral as security, including "all inventory, raw materials, work in process, returned goods, and supplies now owned or hereafter acquired." Additionally, the security agreement enumerated other items as collateral, such as machinery, equipment, furniture and fixtures, and accounts receivable. Farmers' security interest in the SBA loan was perfected when it filed a combined financing statement and security agreement in the Harrison County Court Clerk's Office on April 9, 1981.
 
 
 12
 The SBA authorization and loan agreement identified the collateral as a "[s]ecurity interest, under the Uniform Commercial Code on: all machinery, equipment (excluding licensed motor vehicles), furniture and fixtures; all inventory, excluding any floorplanned vehicles ..." and all accounts receivable.
 
 
 13
 On October 8, 1981, Farmers filed a financing statement in the Harrison County Court Clerk's Office showing Farmers as the secured party, and Bluegrass Ford-Mercury as the debtor, covering "[a]ll new & Used vehicles in the inventory of Bluegrass Ford Merc., Inc." By this time, Bluegrass Ford-Mercury had become indebted to Farmers in the amount of $230,985.53 on licensed and floor plan vehicles.
 
 
 14
 On January 5, 1982, Bluegrass filed a Chapter 11 bankruptcy petition. During the 89-day period between the October 8, 1981, filing of the financing statement securing the inventory and the filing of the bankruptcy petition on January 5, 1982, the debtor made principal payments of $91,950.31 and interest payments of $10,545.54 on the floor plan note debt incurred before October 8, 1981. As of January 5, 1982, Bluegrass owed a balance of $139,035.22 on floor plan loans originated before October 8, 1981. Vehicles financed pursuant to these notes (executed before October 8, 1981), which were in inventory on January 5, 1982, were sold in the Chapter 11 proceeding. The proceeds of this sale, $23,938.87, were paid to the defendant.
 
 
 15
 Also during this period the bank loaned an additional $109,733.61 to purchase more vehicles under the floor plan. Bluegrass executed notes for these loans as well. Of this debt, $29,877.88 had been repaid at the time of the bankruptcy filing, leaving $79,855.73 unpaid. After the bankruptcy filing, an additional $8,635.89 was paid on these loans. The vehicles, the subject of the post-October 8, 1981, loans, were sold for $31,810.95. These proceeds were held in escrow.
 
 
 16
 Additionally, Bluegrass Ford-Mercury made three payments of $4,667 on the SBA loan within 90 days of filing the Chapter 11 proceeding. After it filed the petition, Bluegrass made two further payments of $4,667 each. Thus, the total payments made on the SBA loan, within the 90-day period before filing and after the Chapter 11 filing, were $23,335.
 
 
 17
 Bluegrass, as debtor in possession, brought this proceeding to recover certain payments it made to Farmers as preferential. The bankruptcy court held in favor of Bluegrass. The bankruptcy court ordered Farmers to pay Bluegrass the following:
 
 
 18
 A. $91,950.31 for payments received by Defendant within ninety (90) days of the filing of Plaintiff's Petition under Chapter 11 of the Bankruptcy Code, on indebtedness evidenced by vehicle loans made by Defendant to Plaintiff more than ninety (90) days prior to the filing of said Petition.
 
 
 19
 B. $10,545.54 for interest payments received by Defendant within ninety (90) days of the filing of said Petition, on indebtedness evidenced by vehicle loans made by Defendant to Plaintiff more than ninety (90) days prior to the filing of said Petition.
 
 
 20
 C. $26,938.87 from the sale during the pendency of Plaintiff's Chapter 11 proceeding of vehicles acquired by the Plaintiff prior to October 8, 1981.
 
 
 21
 D. $23,335.00 for payments received by Defendant within ninety (90) days of and immediately following the filing of said Petition on the SBA loan of Defendant to Plaintiff.
 
 
 22
 E. $32,028.51 for prejudgment interest on $58,749.82 of the foregoing amounts set forth in A through D hereof, which $58,749.82 has been held on deposit by the parties pursuant to prior orders of this Court.
 
 
 23
 F. $90,319.45 for prejudgment interest on the remaining $94,019.90, of amounts set forth in A through D hereof, not mentioned in Item E hereof.
 
 
 24
 The bank appealed, and the district court affirmed the bankruptcy court's decision.
 
 
 25
 Farmers then appealed to this court.
 
 II.
 
 26
 Farmers first argues that it is a perfected, secured creditor and, thus, the payments Bluegrass made could not be avoided as preferences. A preference is "a transfer that enables a creditor to receive payment of a greater percentage of his claim against the debtor than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankrupt estate." H.R.Rep. No. 595, 95th Cong., 1st Sess. 177 (1977) U.S.Code Cong. & Admin.News 1978, pp. 5787, 6137 (hereinafter House Report).
 
 
 27
 Title 11 U.S.C. § 547(b), entitled preferences, provides the following:[2]
 
 
 28
 (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor--
 
 
 29
 (1) to or for the benefit of a creditor;
 
 
 30
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 
 
 31
 (3) made while the debtor was insolvent;
 
 
 32
 (4) made--
 
 
 33
 (A) on or within 90 days before the date of the filing of the petition; or
 
 
 34
 (B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer--
 
 
 35
 (i) was an insider; and
 
 
 36
 (ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and
 
 
 37
 (5) that enables such creditor to receive more than such creditor would receive if--
 
 
 38
 (A) the case were a case under chapter 7 of this title;
 
 
 39
 (B) the transfer had not been made; and
 
 
 40
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
 
 
 41
 Thus, to avoid a payment as preferential, the bankruptcy trustee must prove the above five factors.
 
 
 42
 The House Report explained the purpose of the preference provision as follows:
 
 
 43
 First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally.
 
 
 44
 House Report at 177-78. U.S.Code Cong. & Admin.Code 1978 pp. 6137, 6138.
 
 
 45
 Pursuant to section 547(b)(5), the bankruptcy "court must decide the transferee's class and determine what distribution that class would have received had the transfer not been made." 2 Collier On Bankruptcy § 547.08. In the present case, the bankruptcy court found that Bluegrass' unsecured creditors would not have received distributions under Chapter 7. Thus, Farmers' motivation for asserting that it was a perfected, secured creditor is that, without this status, it would have to forfeit all of the payments at issue.
 
 
 46
 The determination of whether and when a security interest is perfected is determined by Kentucky law. Kentucky Revised Statutes § 355.9-303(1) provides the following:
 
 
 47
 (1) A security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken. Such steps are specified in KRS 355.9-302, 355.9-304, 355.9-305 and 355.9-306. If such steps are taken before the security interest attaches, it is perfected at the time when it attaches.
 
 
 48
 Kentucky Revised Statutes § 355.9-302(1) specifies that "[a] financing statement must be filed to perfect all security interests...." Farmers argues that both a financing statement filed in 1977, which references Bluegrass' predecessor, and another financing statement filed in 1981, served to perfect its interest in Bluegrass FordMercury's inventory. Thus, the central question for appellate review is whether either of these financing statements perfected Farmers' security interest in Bluegrass Ford-Mercury's inventory. We note that none of the other prerequisites to perfection required by Kentucky law is challenged on appeal.
 
 A. 1977 Financing Statement
 
 49
 Farmers argues that the 1977 financing statement it filed with Bluegrass Ford, Inc., perfected its interest in the after-acquired inventory of Bluegrass Ford-Mercury, Inc. Kentucky Revised Statutes § 355.9-306(2) determines whether a security interest continues in collateral after a transfer of collateral by a debtor. It provides the following:
 
 
 50
 (2) Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.
 
 
 51
 The corresponding UCC provision does not differ in any material respect from Kentucky's Code. A recent commentary restated the comparable UCC provision as follows: "Section 9-306(2) states the general rule that a security interest in collateral is not terminated upon a disposition of the collateral and can be enforced against the collateral in the hands of the transferee." Permanent Editorial Board Commentary on the Uniform Commercial Code No. 3 Sections 9-306(2) and 9-402(7) 9 (1990) (hereinafter Commentary). This provision makes it clear that a debtor cannot avoid or nullify a security interest in property by sale or transfer.
 
 
 52
 This provision also contains an exception to this general rule, however. If a secured party authorizes the disposition of its collateral and, additionally, the secured party has, "by agreement or otherwise, [authorized the disposition of the property] free and clear of the security interest," id. at 10, then the transferee will acquire the property free of the security interest.
 
 
 53
 In the present case, the record is unclear as to whether Farmers authorized the transfer, and, if it did, whether it authorized the transfer only subject to its continuing security interest. The district court concluded that "the bank would seem to have known of the transfer and accepted it." Although the bank was indisputably aware of the transfer, no evidence was presented regarding the conditions, if any, to the transfer. We will assume that the bank's security interest in the inventory continued after the transfer of the inventory to Bluegrass Ford-Mercury. Despite this assumption in the bank's favor, the bank still does not prevail in its argument that it had a security interest in all of the inventory of Bluegrass Ford-Mercury.
 
 
 54
 After assuming that Farmers' security interest continued, we must next determine whether its security interest was perfected. Kentucky Revised Statutes § 355.9-402 enumerates the requirements for an effective financing statement. Specifically, at issue here is the interpretation of subsection (7). Kentucky Revised Statutes § 355.9-402(7) provides:
 
 
 55
 (7) A financing statement sufficiently shows the name of the debtor if it gives the individual, partnership or corporate name of the debtor, whether or not it adds other trade names or the names of partners. Where the debtor so changes his name or in the case of an organization its name, identity or corporate structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four (4) months after the debtor notifies the secured party in writing of the change, unless a new appropriate financing statement is filed before the expiration of that time. A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer.
 
 
 56
 Again, we note that the corresponding UCC provision, § 9-402(7), is nearly identical.[3]
 
 
 57
 The last sentence in section 9-402(7) is particularly applicable to the facts before us. "A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer." Id. Thus, this sentence, when read together with section 9-306(2), supports the following interpretation.
 
 
 58
 If the secured party does not authorize the disposition or if the secured party authorizes the disposition subject to the security interest, the security interest will continue in the collateral following the disposition (§ 9-306(2)) and no new financing statement or amendment to the existing financing statement will be required in order to continue the perfected status of the security interest in the collateral following the disposition (§ 9-402(7)).
 
 
 59
 Commentary at 12. Thus, any collateral transferred from Bluegrass to Bluegrass Ford-Mercury would be subject to Farmers' security interest, which was perfected by the 1977 financing statement.[4] The issue is whether Farmers' security interest included those vehicles acquired by Bluegrass Ford-Mercury after Bluegrass Ford's transfer of inventory.
 
 
 60
 Because the financing agreement covered all inventory, i.e., as written it would include the cars that Bluegrass Ford acquired after the financing statement was filed, Farmers argues that its security interest, including "all inventory of Bluegrass[,] remained valid." We disagree. We note that the third sentence of UCC section 9-402(7), Ky.Rev.Stat. § 355.9-402, operates with respect "to collateral transferred by the debtor...." Ky.Rev.Stat. § 355.9-402(7). We do not interpret this language to encompass collateral not yet acquired by the transferee debtor.
 
 
 61
 In In re Meyer-Midway, 65 B.R. 437 (Bankr.N.D.Ill.1986), a bankruptcy court reviewed section 9-402(7) as it applied to a corporate merger. The bankruptcy trustee in Meyer argued that "[a]ny receivables generated after the merger ... could not have been collateral transferred by Meyer and Midway because they were not in existence at the time of the merger." Id. at 443-44 (emphasis in original). The bankruptcy judge agreed and held that "the bank would be obligated to file a revised financing statement to be perfected in new collateral or collateral intended to secure the bank under the after-acquired property clause." Id. (emphasis in original).
 
 
 62
 The Meyer rationale is applicable to the facts before us. The 1977 financing statement states that the bank has a secured interest in the inventory of Bluegrass Ford, the corporate entity. The Bluegrass Ford dealership no longer had an inventory after its assets were sold to Bluegrass Ford-Mercury. We agree with the Meyer court when it stated that to hold that the secured creditor's interest is still perfected as to property later acquired by the transferee "would 'infect' with perfection, under a financing statement listing the transferor as the debtor, any property later acquired by the successor entity." Id. at 444.
 
 
 63
 Farmers further asserts that the bankruptcy court erred in distinguishing between the second sentence of section 9-402(7), which relates to name changes, and the third sentence, which addresses transfers in collateral. Farmers argues that it was only required to file a new financing statement if the 1977 statement were seriously misleading. Farmers also argues that because the corporate names of the dealership were similar, the dealerships were located at the same address, and the county in which the dealerships were located was the same, adequate notice was provided to subsequent creditors.
 
 
 64
 We disagree with this interpretation of section 9-402(7). The Ninth Circuit in Bank of the West v. Commercial Credit Financial Services, 852 F.2d 1162 (9th Cir.1988), concluded that "the second and third sentences of 9402(7) [California's provision corresponding to 9-402(7) ] are meant to apply in different circumstances." Id. at 1169. The second sentence relates to changes in the identity or structure of the debtor in which the "new" debtor is a successor enterprise of the original debtor, whereas the third sentence relates to transfers of collateral to independent third parties. Id. The distinct application of these provisions becomes blurred when there is a transfer of collateral between related entities, as was the case in Bank of the West. But we are not confronted with that situation here. It cannot be claimed that Bluegrass Ford-Mercury is a related corporate successor to Bluegrass Ford. The bankruptcy and district courts both found that Bluegrass Ford and Bluegrass Ford-Mercury were distinct corporate entities with unrelated owners. Farmers has not challenged this finding on appeal. Thus, only the third sentence of section 9-402(7) is applicable, i.e., "[a] filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer." U.C.C. § 9-402(7). We therefore affirm the bankruptcy court's conclusion that the 1977 financing statement did not perfect Farmers' security interest in Bluegrass Ford-Mercury's after-acquired inventory.
 
 B. SBA Financing Statement
 
 65
 In the alternative, Farmers argues that it perfected its security interest in Bluegrass Ford-Mercury's inventory via a financing statement it filed in conjunction with the loan Bluegrass received that was guaranteed by the SBA. The financing statement was filed on April 9, 1981.
 
 
 66
 The bankruptcy court found that the financing statement and security agreement dated March 27, 1981, and recorded on April 9, 1981, effectively granted Farmers a security interest in all of the dealership's equipment, accounts receivable, etc., except the "floorplanned vehicles."
 
 
 67
 Farmers argues that the bankruptcy court's limitation of the collateral securing the SBA loan is erroneous. Specifically, Farmers asserts that both the bankruptcy and district courts mistakenly relied on the description of collateral in the SBA loan authorization form rather than the one in both the security agreement and financing statement that Farmers filed in connection with the SBA loan. We disagree.
 
 
 68
 The security agreement and financing statement, which were included in one document, do not explicitly exclude floor plan vehicles. The section addressing collateral reads as follows: "All inventory, raw materials, work in process, returned goods, and supplies now owned or hereafter acquired." (Emphasis added). Unlike the security agreement and financing statement, the SBA loan authorization agreement specifically excludes floor plan vehicles from coverage. The section governing collateral lists the following: "Security interest, under Uniform Commercial Code on ... all inventory, excluding any floorplanned vehicles...."
 
 
 69
 As a rule, the collateral description in a valid security agreement controls, and no extraneous materials will be considered. See Ky.Rev.Stat. § 355.9-201. Thus, at first glance, it would appear that the word "inventory" included floor plan vehicles because the security agreement does not exclude them from its collateral description. Closer scrutiny of the security agreement reveals that the floor plan vehicles could not have been used as collateral for the SBA note. The next section of the security agreement after the collateral description reads as follows:
 
 
 70
 3. Debtor warrants that Debtor is the absolute owner of the legal and beneficial title to the collateral (exclusive of hereinafter acquired, replacement or hereinafter-created items) and is in full possession thereof, and that same is free and clear of all liens, encumbrances and adverse claims whatsoever, except:
 
 
 71
 (NONE, unless here below stated):
 
 
 72
 No items were listed as exceptions to this provision. The debtor, Bluegrass Ford-Mercury, was not the "absolute owner," "free and clear of all liens," of the floor plan vehicles. The vehicles were necessarily collateral for the floor plan notes executed between Farmers and Bluegrass. Thus, they could not, under the terms of the security agreement, be collateral for the SBA note.
 
 
 73
 This conclusion is further supported by the SBA loan authorization agreement, which specifically excludes floor plan vehicles from its description of collateral. Additionally, a former executive vice president of Farmers, who closed Bluegrass' SBA loan, testified that Farmers had never varied its collateral descriptions from those in the SBA loan agreements and that Farmers did not request more collateral than that authorized by the SBA.
 
 
 74
 As a result, we conclude that the security agreement did not include floor plan vehicles as collateral. We note that our conclusion is compatible with the function of a financing statement, which, in this case, was combined with the security agreement in the same document. A financing statement provides notice to third parties as to the scope of a security interest, including a collateral description. This notice protects potential creditors from securing as collateral property that is already collateral for another secured creditor. A third party, to protect its interest, would interpret the term "inventory" as used in the financing statement broadly, i.e., to include floor plan vehicles. Thus, although we conclude that floor plan vehicles were not included, a potential creditor would not be harmed by our interpretation.[5]
 
 
 75
 Our finding with regard to the SBA loan's collateral, however, does not resolve the other issue. That is, whether the bank's perfected security interest flowing from the security agreement and financing statement executed in connection with the SBA loan, extends to the floor plan notes executed afterwards.
 
 
 76
 Just as the security agreement represents the bargained-for agreement between the parties with regard to the collateral for the security interest, it also defines the security interest to which the parties agreed. The security agreement provides that it is to
 
 
 77
 secure the payment of a loan owed by Debtor to Secured Party in the amount of $250,000.00, plus all costs, expenses, advances, and liabilities which may be made or incurred by Secured Party in the disbursement, administration and collection of the loan and in the protection, maintenance and liquidation of the collateral, with interest on all the aforesaid.
 
 
 78
 (Emphasis added). The entire purpose of the bank's security interest was to secure the SBA-guaranteed loan. The security agreement, in defining the security interest, fails to state that its function is to secure anything in addition to the loan. It does not refer, even in an oblique sense, to securing an interest in the floor plan notes. Thus, we find that both the bankruptcy and district courts correctly held that the SBA loan's financing statement did not perfect the bank's security interest in the floor plan notes.
 
 III.
 
 79
 Farmers also argues that, even if it is an unsecured and unperfected creditor, Bluegrass failed to prove all of the elements of a preferential transfer pursuant to 11 U.S.C. § 547(b). Thus, the payments Bluegrass made to Farmers during the preference period do not have to be refunded. Farmers asserts that Bluegrass failed to prove that it was insolvent during the preferential period and that the transfers allowed Farmers to receive more than it would have under a Chapter 7 liquidation.
 
 
 80
 Title 11 U.S.C. § 547(b)(3) enables the trustee, in this case Bluegrass, to avoid any transfers made while the debtor was insolvent. Section 547(f) of the same title provides that, "[f]or the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f). Thus, to prevail, Farmers was required to present evidence to rebut this presumption.
 
 
 81
 Farmers argues that it introduced monthly financial statements filed by the debtor during this period, which the debtor submitted to Ford Motor Company. Farmers asserts that these documents demonstrate that Bluegrass was solvent because they show that total assets exceeded liabilities. At trial, Bluegrass' owner testified that these financial statements were misleading because they included personal assets, as well as personal liabilities, of the owners. The bankruptcy court concluded that if the financial statements were adjusted to reflect only Bluegrass' corporate assets, Bluegrass' liabilities exceeded its assets for each month during the preference period. This inference is further supported by Bluegrass' 1980 tax return, which showed a net loss of approximately $95,000.
 
 
 82
 The bankruptcy court's findings of fact with regard to Bluegrass' assets and liabilities during the preference period can be reversed only if clearly erroneous. In light of the testimony and supporting documentation demonstrating the misleading nature of the financial statements submitted to Ford, we cannot conclude that the bankruptcy court's determination was clearly erroneous.
 
 
 83
 Farmers also takes issue with the bankruptcy court's valuation of the leasehold interest Bluegrass had in the Morris' real property. The bankruptcy court assessed the value at $200,000. This was based on the price received at a public auction in June 1983. Farmers argues that fair market value, rather than liquidation value, should be used to determine corporate assets. Farmers asserts that the leasehold should have been valued at $350,000, the price Morris paid Webber when he purchased the dealership. The bankruptcy court found this argument "unpersuasive," and so do we. Farmers states that "it was not its burden to show the leasehold value, but rather the burden of Bluegrass to rebut the evidence of solvency." The only figure Farmers offered to establish leasehold value was the price Morris paid Webber. As Bluegrass points out in its brief, however, the contract price included all of Bluegrass' property. Thus, Bluegrass concludes, "this is evidence of the value of the entire business, not evidence of value of the leasehold." We agree with Bluegrass. Because Farmers failed to present adequate evidence to rebut the presumption of insolvency, Bluegrass was under no obligation to offer proof that it was, indeed, insolvent during the preference period.
 
 
 84
 Farmers also argues that Bluegrass failed to prove that the transfer enabled Farmers to receive more than it would have in a Chapter 7 liquidation case. The bankruptcy court found that unsecured creditors would have received nothing under Chapter 7. Farmers does not dispute this finding, but argues that it was a secured creditor. Thus, because we find that Farmers was not a perfected secured creditor, and as such it would not have received any payment under Chapter 7, any payments Farmers received were in excess of the amount to which it was entitled.
 
 IV.
 
 85
 Farmers also argues that at least one of the exceptions to section 547(b) applies. Thus, Bluegrass is not entitled to avoid the payments it made to Farmers as preferential.
 
 
 86
 Title 11 U.S.C. § 547(c) enumerates several exceptions to section 547(b). In particular, Farmers asserts that sections 547(c)(3) and 547(c)(4) apply. Title 11 U.S.C. § 547(c)(3) provides:
 
 
 87
 (c) The trustee may not avoid under this section a transfer--
 
 
 88
 ....
 
 
 89
 (3) of a security interest in property acquired by the debtor--
 
 
 90
 (A) to the extent such security interest secures new value that was(i) given at or after the signing of a security agreement that contains a description of such property as collateral;
 
 
 91
 (ii) given by or on behalf of the secured party under such agreement;
 
 
 92
 (iii) given to enable the debtor to acquire such property; and
 
 
 93
 (iv) in fact used by the debtor to acquire such property; and
 
 
 94
 (B) that is perfected before 10 days after such security interest attaches
 
 
 95
 ....
 
 
 96
 Farmers maintains that it extended new value to Bluegrass in the amount of $109,733.61 during the preference period. Farmers supplied this money so that Bluegrass could acquire new inventory. Also, Farmers contends, Bluegrass used this money to acquire new inventory and that each note and security agreement contained a description of the automobiles Bluegrass acquired.
 
 
 97
 Title 11 U.S.C. § 547(c)(3) "protects a transfer of a security interest to secure an 'enabling loan.' Thus, if a security transfer is made to secure an enabling loan which, in fact, enables the debtor to acquire that collateral, the transfer is not preferential if perfected on or before 10 days after" the security interest attaches. 2 Collier on Bankruptcy § 547.11.
 
 
 98
 The money Farmers provided Bluegrass during this period was used to purchase 21 automobiles. After October 8, 1981, and before January 5, 1982, the bank was paid $29,877.88 on loans made during the same period. Bluegrass has never attempted to avoid these payments as preferential. During the Chapter 11 proceeding some of these vehicles were sold; the total amount received was $31,810.95. The bankruptcy court held that the portion of the Chapter 11 proceeds resulting from the sale of the 21 vehicles financed between October 8, 1981, and January 5, 1982, "is excepted from the amount of preference under title 11 U.S.C. [s] 547(c)(3)."
 
 
 99
 On appeal, it is unclear what argument Farmers is trying to assert under section 547(c)(3). It seems, from the bankruptcy court's references to Farmers' argument before that court and the language in the title to this section in Farmers' brief, that Farmers believes that the remaining balance on these loans for "new value"[6] should be credited against the preferential payments made to Farmers on Bluegrass' other indebtedness. Farmers cites no law for this proposition. We find that Farmers was properly found immune from a preference attack pursuant to section 547(c)(3) by the bankruptcy court for payments Bluegrass made to acquire new inventory after October 8, 1981. To apply the remaining balance on these post-October 8, 1981, loans to offset the preference payments made on other non-secured or perfected loans would, in fact, be elevating Farmers' status to that of a perfected secured creditor on the other loans. This would be contrary to section 547(b)(5)(A)--the section that limits protected payments made during the preference period to the amount the creditor would have received under a Chapter 7 liquidation.
 
 
 100
 Farmers also asserts that the exception provided for in 11 U.S.C. § 547(c)(4) applies. Section 547(c)(4) provides the following:
 
 
 101
 (c) The trustee may not avoid under this section a transfer--
 
 
 102
 ....
 
 
 103
 (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor--
 
 
 104
 (A) not secured by an otherwise unavoidable security interest; and
 
 
 105
 (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor....
 
 
 106
 This section is commonly characterized as a subsequent advance rule. In re Fulghum Constr. Corp., 706 F.2d 171, 172 (6th Cir.), cert. denied, 464 U.S. 935, 104 S.Ct. 342, 343, 78 L.Ed.2d 310 (1983).
 
 
 107
 Farmers argues that the balance due on the notes entered into after October 8, 1981, and before January 5, 1982, should be applied against "the approximately $91,000.00 allegedly preferential payment[s] made by Bluegrass within the 90 days." In essence, Farmers is making the same argument it made for the application of section 547(c)(3). Again, we reject this argument, and for the same reason we rejected it earlier. Farmers was an unsecured, unperfected creditor with regard to the notes on which the approximately $91,000 in payments were made. We cannot apply the balance on Farmers' secured loan toward the payments--which we have concluded were preferential--Bluegrass made to Farmers on its unsecured loans. To do so would improperly subordinate other creditors to Farmers in its role as an unsecured creditor.
 
 
 108
 AFFIRMED.
 
 
 
 *
 The Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The phrase "sale out of trust" refers to sales by a borrower who has not paid off the loan against the units sold. The trust terminology is a holdover from the Trust Receipts Act of the 1930s, which provided the legal foundation for floor plan financing. Floor Planning at 135
 
 
 [2]
 We note that this section was amended in 1984 and again in 1986. For the purposes of this appeal, because this action was initiated prior to the amendments, we will apply the language from the version preceding the amendments in 1984
 
 
 [3]
 The difference between the two provisions is as follows. In the second sentence of the Kentucky statute, "more than four (4) months after the debtor notifies the secured party in writing of the change" is substituted for the UCC language, "more than four months after the change."
 
 
 [4]
 Farmers' perfected security interest in the vehicles transferred from Bluegrass Ford's inventory to Bluegrass Ford-Mercury's inventory remained effective. There is no evidence in the record, however, that any of those vehicles were in Bluegrass Ford-Mercury's inventory during the preference period
 
 
 [5]
 Additionally, Bluegrass' payments on the SBA loan that were made after Bluegrass filed bankruptcy are avoidable. 11 U.S.C. § 549(a)(1)
 
 
 [6]
 Title 11 U.S.C. § 547(a)(2) defines new value as follows:
 (2) "new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, but does not include an obligation substituted for an existing obligation....