CITIZENS SAVINGS BANK, Appellant,

v.

SAC CITY STATE BANK, Appellee.

65513.

Supreme Court of Iowa.

Jan. 20, 1982.
Rehearing Denied Feb. 18, 1982.

Harry T. Watts and Barbara G. Barrett of Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, for appellant.

Thomas L. McCullough and Colin J. McCullough of McCullough Law Firm, P.C., Sac City, for appellee.

Considered by REYNOLDSON, C. J., and LeGRAND, UHLENHOPP, McCORMICK, and SCHULTZ, JJ.

REYNOLDSON, Chief Justice.

In this appeal we are required to examine, as a matter of first impression, several provisions of our Uniform Commercial Code (UCC), chapter 554, The Code, in order to determine which of two Sac City banks, as a prior secured lienholder, is entitled to the liquidated assets of a defunct auto dealership.

Following a bench trial on a petition for declaratory judgment filed by plaintiff Citizens Savings Bank (Citizens), the court held defendant Sac City State Bank (Sac City), as prior lienholder, was entitled to $146,-746.99, constituting the sale proceeds of the dealership assets. This amount currently is held by a third bank stakeholder. Trial court denied Sac City's counterclaim against Citizens for $72,582.51. This sum represented General Motors Corporation (GM) "holdbacks" paid to Citizens on the dealership's assignment. We affirm in part, reverse in part, and remand with directions.

This dispute centers around the validity of certain security agreements, their perfection, and the collateral to which the security agreements, if valid, extend.

Trial court's decree carefully distilled from the record the following relevant facts:

April 7, 1969: Sac City, which had previously been loaning money to Thomas Johnson, on this date receives a security agreement from him for a "loan" covering inventory and accounts receivable and proceeds therefrom. Inventory is defined as including but not limited to, all goods, merchandise, raw materials, goods in process, and finished goods. Accounts receivable includes, but is not limited to all accounts, notes, drafts, instruments, chattel paper and documents. The security agreement contains an after-acquired property clause.

Two provisions of said agreement, relating to all collateral secured, are pertinent to the case at bar:

5. Debtor will not sell, lease or otherwise dispose of any Collateral Inventory other than in the ordinary course of its business at prices constituting the then fair market value thereof, without written consent of Secured Party.

17. ... All rights of Secured Party hereunder shall inure to the benefit of the heirs, executors, administrators, successors and assigns of Secured Party; and all obligations of Debtor shall bind the heirs, executors, administrators, successors and assigns of Debtor.

November 17, 1970: Sac City files a financing statement numbered G–65180 covering the same collateral as the security agreement and listing the debtor as "Thomas S. Johnson d/b/a Tommy Johnson Chev. Co."

May 1st, 1972: The auto dealership is incorporated as "Tommy Johnson Chevrolet, Inc." [TJC, Inc.] All assets of the operating proprietorship of Thomas S. Johnson are transferred to the corporation. The corporation retains the same address, employees, telephone number and business. Evidence reveals that Sac City knew of the incorporation at least in the early part of May, if not before. Thomas S. Johnson executes a personal guaranty to Sac City on this date guaranteeing payment of indebtedness of "Tommy Johnson Chev., Johnson Motors, Tommy

Johnson Chev. Inc. and Tommy Johnson" to Sac City.

May 1972 through November 1972: Payments made on two notes from Thomas S. Johnson which were executed on January 5, 1970 and February 19, 1971 and [drawn] on the dealership's corporate account in Citizens.

May 3, 1972: A resolution of the corporate board authorizing the corporation to procure loans from Sac City is executed by Corinne M. Johnson and Thomas S. Johnson, secretary and president of the corporation respectively.

October 24, 1972: Citizens files a financing statement covering inventory, some real estate and proceeds of said collateral and lists debtor as "Tommy Johnson Chevrolet, Inc. formally (sic) d/b/a Tommy Johnson Chevrolet Co., a/k/a Thomas S. Johnson, Sac City, Iowa 50583."

November 9, 1972: Thomas S. Johnson and his wife filed for a real property arrangement under Chapter XII of the Bankruptcy Act.

December 12, 1972: Sac City filed a claim in the Johnson bankruptcy for the amount of notes claimed here.

1972–1977: Sac City purchased consumer paper with full recourse from the corporation. Payments were made on the corporate account in Citizens. Approximately $88,000.00 of consumer paper remains unpaid.

January 3, 1973: Thomas S. Johnson and his wife filed a proposed plan with the bankruptcy court. Sac City accepted the plan.

January 23, 1973: Citizens requested a UCC lien search on the following: (1) Johnson, Thomas Stratford and Corinne Johnson, Husband and Wife d/b/a Tommy Johnson Chev., Inc., Sac City, Iowa; and (2) Tommy Johnson Chevrolet, Inc., formally (sic) d/b/a Tommy Johnson Chevrolet Co., a/k/a Thomas S. Johnson, Sac City, Iowa. The search revealed only Plaintiff's financing statement.

On the same date Citizens requested a UCC search on "Tommy Johnson Chevrolet Co., Sac City, Iowa 50583." Said

search revealed the Sac City financing statement, G–65180, and General Motors Acceptance Corporation's financing statement.

February 1, 1973: Citizens assists [TJC, Inc.] in filing an SBA loan application. The application acknowledges Sac City's first lien.

July 24, 1973: [TJC, Inc.] executes a security agreement with Citizens. A security interest is granted in: accounts receivable, dealer holdbacks, warranties, dealer reserves and credits for parts returned to Chrysler Motors Corporation, Chevrolet Motor Division and GMAC.

November 11, 1975: Sac City files a continuation statement with the Secretary of State on items covered by the November 17, 1970 statement, G–65180.

March 7, 1977: Citizens again assists [TJC, Inc] with an SBA loan application on which Sac City's first lien is noted.

September 12, 1977: Evidence shows Citizens received a security agreement from the corporation covering: accounts, contract rights, general intangibles, furniture, fixtures, inventory, machinery equipment and after-acquired property and proceeds therefrom. . . .

September 13, 1977: Financing Statement covering the above-described items is filed with the Secretary of State.

November, 1977: The corporation ceases doing business and assets are sold.

November 24, 1977: Sac City begins listing debtor as "Tommy Johnson Chev. Inc.," in its ledger.

September 13, 1977: Citizens requests a UCC lien search on, *inter alia*: (1) "Tommy Johnson Chev. Inc.," and (2) "Tommy Johnson Chev. Inc." The search reveals the Sac City financing statement G–65180 and its timely continuance.

April 28, 1978: Sac City withdraws its claims in the Thomas S. Johnson bankruptcy.

June 12, 1978: Supplemental bankruptcy court order stating Sac City's claim was withdrawn by reason of claim satisfaction from sale of secured property.

September 25, 1978: The instant action is filed.

January 29, 1979: Thomas S. Johnson's bankruptcy plan was confirmed by the bankruptcy court.

(Citations omitted.)

Before proceeding to the substantive issues relating to lien priorities, we address three threshold questions: whether our review is in law or equity; whether the amount of Sac City's debt was adequately established; and whether our statutory law before or after January 1, 1975, the date significant amendments to our UCC took effect, applies.

## I. *Is Our Review in Law or Equity?*

No factual dispute looms large in this controversy. For the most part, our determination is controlled by issues of law, thus we are not bound by trial court's legal conclusions. *See Chown v. USM Corp.*, 297 N.W.2d 218, 220 (Iowa 1980). Nonetheless, Sac City contends the action was tried as a law action, thus seeking to insulate trial court's fact-findings from de novo review and to support the relief it obtained in the decree. Citizens asserts the case was tried in equity and should be reviewed de novo.

After Citizen's "Petition For Declaratory Judgment In Equity" was filed, Sac City successfully moved to transfer the cause from equity to law, and demanded a jury trial. Later Citizens, citing *Freese Leasing, Inc. v. Union Trust and Savings Bank*, 253 N.W.2d 921 (Iowa 1977), moved to transfer the case back to equity. This motion was not ruled on. The case was tried to the court in June 1980. Trial court did not rule on evidentiary objections and later entered its "decree."

■ Ordinarily, whether a declaratory judgment action is a legal or equitable proceeding is determined by the pleadings, the relief sought, and the nature of the case. *Eldridge v. Herman*, 291 N.W.2d 319, 321 (Iowa 1980); *Freese Leasing*, 253 N.W.2d at 925; *see* Iowa R.Civ.P. 267. We have consistently held, however, that we will consider and review a case on appeal in the manner it was treated below. *See Life Investors Insurance Co. of America v. Heline*, 285 N.W.2d 31, 35 (Iowa 1979); *Bram-*

*mer v. Allied Mutual Insurance Co.*, 182 N.W.2d 169, 172 (Iowa 1970); *Bjork v. Dairyland Insurance Co.*, 174 N.W.2d 379, 382 (Iowa 1970). Where there is uncertainty, a litmus test we have applied is whether evidentiary objections were ruled on by trial court. *See Sille v. Shaffer*, 297 N.W.2d 379, 380–81 (Iowa 1980); *Bjork*, 174 N.W.2d at 382. A "decree" is generally considered a final order of an equity court, *Black's Law Dictionary* 369–70 (5th ed. 1979), although a decree would be included within the broad definition of a "judgment" found in Iowa Rule of Civil Procedure 219.

■ At trial the evidentiary objections were not ruled on and no protest was raised. There is no indication Sac City sought to implement its demand for jury trial. None of the trial motions ordinarily made in a law action appear in the transcript. Trial court's ruling was labeled a "decree." We conclude this action was tried in equity below, and thus should be reviewed de novo in this court.

## II. *Was There Sufficient Evidence to Support Sac City's Claim?*

Citizens now argues there was insufficient evidence to support trial court's finding of $196,337.41 in underlying indebtedness to Sac City and therefore no support for Sac City's claim to any of the proceeds held by the third party bank. Of course if we agree we need not reach the major priority issue in this appeal. Sac City argues the indebtedness owed it was sufficiently established and this issue was not raised below.

■ It is true, as Citizens asserts, that even in a law action a trial court finding that has no support in the record must be set aside. *See Novak Equipment, Inc. v. Hartl*, 168 N.W.2d 924, 926 (Iowa 1969). Here, of course, we are reviewing the evidence de novo. We give weight to the findings of the trial court, especially when considering the credibility of witnesses, but we are not bound by them. Iowa R.App.P. 14(f)(7).

In this declaratory judgment action the fighting issue, both in the pleadings and evidence, was the priority of the respective liens, not the amount of indebtedness owed Sac City. Both parties introduced exhibits evidencing various sums owed to Sac City, in a total amount more than Sac City ultimately claimed. The president of Sac City more than once testified without objection to the balance owed. Citizens made no motion to enlarge trial court's findings or in any other manner drew to the attention of the court or Sac City the alleged omission it now relies on. We hold Citizens' contentions in this regard are without merit.

### III. *What Statutory Law Applies?*

While this case was developing article 9 of Iowa's UCC was amended, effective January 1, 1975. § 554.11101, The Code 1981. Both Sac City and Citizens had secured and perfected security interests before 1975. On September 12, 1977, Citizens obtained another security agreement from TJC, Inc., and filed the related financing statement the following day.

The effect of the pre-1975 security interests will be determined by the UCC provisions in effect at the time of the transactions:

*Transition provisions as to priorities.* Except as otherwise provided in this Article, this chapter prior to amendment shall apply to any questions of priority if the positions of the parties were fixed prior to January 1, 1975. In other cases questions of priority shall be determined by this chapter as amended.

§ 554.11107, The Code 1981. A second relevant article 9 section is 554.11108, which provides:

Unless a change in law has clearly been made, the provisions of this chapter as amended shall be deemed declaratory of the meaning of this chapter prior to amendment. The first sentence of section 554.9402, subsection 7, shall be deemed a change in the law.

The legislature's reference to only the *first* sentence of subsection 554.9402(7) is significant here, because the three-sentence subsection first appeared in the 1975 amendments. Thus there is an implication that the last two sentences, relating to name changes of the debtor and transfer of collateral by the debtor, are merely declaratory of the prior law as provided by section 554.11108.

Our references in this opinion will be to the Code 1971 in discussing the preamendment statutory law. For the purposes of this appeal, where the 1975 amendments did not significantly change the prior statutes, or where we are referring specifically to postamendment law, our references will be to the Code 1981.

### IV. *Does Sac City Have Priority in the Proceeds of the Collateral Transferred to TJC, Inc.?*

Trial court's recital of relevant facts (which, except as hereafter noted, we find in our de novo review to be fully supported in the record) reflects that when Thomas S. Johnson's dealership assets were transferred to TJC, Inc., the inventory and accounts receivable were subject to a first perfected security interest held by Sac City. This is not contested by Citizens. The latter bank contends Sac City lost its security interest in these assets because it authorized this disposition of the collateral.

This transfer of the collateral occurred in May 1972, therefore the pertinent statute is section 554.9306(2), The Code 1971:

Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor *unless. his action was authorized by the secured party in the security agreement or otherwise*, and also continues in any identifiable proceeds including collections received by the debtor.

(Emphasis added.) This section has been amended slightly since 1971, but not substantively changed. *Compare* § 554.9306(2), The Code 1971 *with* § 554.9306(2), The Code 1981.

There was no written authorization for this specific sale or disposition. Citizens

places some reliance on paragraph 17 of Sac City's security agreement (set out in trial court's findings, above) that provides the "obligations of the Debtor shall bind the ... successors and assigns of Debtor." To interpret this as an authorization for a subsequent transfer free of the security interest would violate the overall intent and purpose of the agreement, and require us to nullify paragraph 5 (quoted above) that forbids this type of disposition without the written consent of the secured party.

We agree with trial court that no conduct of Sac City could be interpreted as a section 554.9306(2) authorization. Although the testimony is conflicting, we find Sac City did not know of the incorporation and transfer of assets until shortly after the event. We have held a *prior* course of dealing may overcome express terms in the security agreement and translate into an authorization for sale free of lien. *Hedrick Savings Bank v. Myers*, 229 N.W.2d 252, 256 (Iowa 1975); *Lisbon Bank and Trust Co. v. Murray*, 206 N.W.2d 96, 98 (Iowa 1973); *see* § 554.1205(1), The Code. But here there was no prior course of dealing to support a finding that Sac City authorized a bulk conveyance of business assets.

Citizens relies on *In re Vieths, Inc.*, 9 U.C.C.Rep.Serv. 943 (Callaghan) (Bankr.E. D.Wis.1971), as authority for finding, under the facts before us, a section 554.9306(2) authorization for a bulk transfer of collateral. We are not required to address the *Vieths* court's analysis since that case, although involving a priority dispute after a sole proprietor incorporated, is distinguishable on its facts because the secured party knew about the collateral disposition before it occurred. The court in dictum stated:

Thus if the debtor in this case had formed a corporation and then transferred his assets to the corporation without the knowledge or consent of the bank, the

bank's lien on the original collateral would have continued.

*Vieths*, 9 U.C.C.Rep.Serv. at 948.

Because we find Sac City did not authorize the transfer from Johnson to the corporation, Sac City's security interest continued in its collateral transferred to TJC, Inc., and in any "identifiable proceeds"[1] from the disposition of that collateral. *See* § 554.9306(2), The Code. Sac City's subsequent knowledge of the transfer does not change this result.

The third sentence of subsection 554.-9402(7), The Code, provides:

A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of the transfer.

This third sentence, unlike the first sentence in subsection 554.9402(7), The Code 1977, is not deemed a change in the law but declaratory of the meaning of the law at the time these events occurred. *See* § 554.-11108, The Code. Therefore, a new financing statement was not required to preserve Sac City's priority for this collateral.

## V. Did Sac City have a Security Interest in Assets Later Acquired by TJC, Inc.?

■ The record discloses the money held by the stakeholder bank resulted from the sale of assets of TJC, Inc. Some of these assets were acquired from Tommy Johnson and subject to the perfected security interest of Sac City. The corporation acquired other assets after it took over the dealership. Citizens insists Sac City had no security interest in the corporation's after-acquired personal property because Sac City did not have possession of this personalty or a security agreement signed by the corporation, citing subsection 554.9203(1), The Code, and *Kaiser Aluminum & Chemical Sales, Inc. v. Hurst*, 176 N.W.2d 166, 168 (Iowa 1970).

---

1. "Identifiable proceeds" is not defined in the UCC. *See* Universal C.I.T. Credit Corp. v. Farmers Bank of Portageville, 358 F.Supp. 317, 323-24 (E.D.Mo.1973). Subsection 554.-

9306(1), The Code, defines "proceeds" as including "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds."

Sac City seeks to cloak the corporation's after-acquired property with its security interest in Tommy Johnson's transferred assets, placing reliance on the second sentence of subsection 554.9402(7), The Code:

A financing statement sufficiently shows the name of the debtor if it gives the individual, partnership or corporate name of the debtor, whether or not it adds other trade names or the names of the partners. *Where the debtor so changes his name or in the case of an organization its name, identity or corporate structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new appropriate financing statement is filed before the expiration of that time.* A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of the transfer.

(Emphasis added.) We have carefully analyzed the second sentence of this section. It distinguishes between debtor and organization in the first clause. However, the UCC definitions of debtor and organization may overlap. *See* §§ 554.9105(1)(d) (debtor), .1201(30) (person), .1201(28) (organization), The Code. Consequently, we conclude the first reference to debtor refers to individual debtors. *See id.* §§ 554.-9105(1)(d), .1201(30). The second reference to debtor includes both individuals and organizations. *See id.* §§ 554.-9105(1)(d), .1201(30), .1201(28).

Sac City analyzes the situation before us as one of a mere "name change" that was not seriously misleading, hence its security interest covered after-acquired personalty of the corporation. There are at least three fatal flaws in this analysis.

First, this was not a name change situation. The dealership had been operated as a sole proprietorship. Thomas S. Johnson did not change his name. A corporation was formed with four stockholders: Thomas Johnson, Corinne Johnson, Gerald Bunker, and Bob Johnson. Although the address, employees, phone number, and business remained the same after incorporation, the business structure, documentation, employer's identification numbers, tax forms, checking accounts, and advertising did change. Sac City made no effort to establish those factors to be considered in "piercing the corporate veil." *See Northwestern National Bank v. Metro Center, Inc.*, 303 N.W.2d 395, 398–99 (Iowa 1981). On this record we cannot view the corporation as the alter ego of Johnson. We must treat it as a distinct and different legal entity.

This leads us to the second flaw. The corporation cannot be viewed as "the debtor" as that reference appears for the second time in the second sentence in subsection 554.9402(7). Following the context of the sentence as applied to the facts of this case, the debtor acquiring collateral must be the same debtor whose name, identity, or corporate structure has been changed. But TJC, Inc., did not undergo any of these changes.

Finally, Sac City's financing statement was insufficient to perfect a security interest in after-acquired property of the corporation. Subsection 554.9402(1), The Code 1971, required that the financing statement be signed by the debtor. Further, section 554.9402(3), The Code 1971, makes it clear that the name of the debtor should be on the financing statement. *See also* § 554.-9403(4), The Code. Sac City's financing statement does not carry the name of TJC, Inc. Thus even if Sac City had a security interest in the corporation's after-acquired property, it was never perfected.

Many of the conflicting authorities relied on by the respective parties are exhaustively analyzed by William M. Burke, Chairman of the Committee on Uniform Commercial Code of the American Bar Association Section on Corporation, Banking and Business Law, in *The Duty to Refile Under Section 9–402(7) of the Revised Article 9*, 35 Bus. Law. 1083 (1980). Burke thus distills the rule that in varying factual situations will best withstand rigid scrutiny under applicable UCC provisions:

With respect to new property acquired by the transferee, the secured creditor

must establish both the existence of security interest in the property and perfection of the security interest. Assuming that the secured creditor can establish the existence of a security interest in the property acquired by the transferee, the last sentence of section [554.9402(7), The Code] clearly does not operate to perfect the security interest. The new property acquired by the transferee is by definition not "collateral transferred by the debtor," within the meaning of the last sentence of section [554.9402(7), The Code]; and a financing statement filed in the name of the transferor can not perfect a security interest in property acquired by the transferee. *As to new property acquired by the transferee after the transfer, the secured creditor should obtain a new security agreement signed by the transferee and file a new financing statement signed by the transferee.*

*Burke*, 35 Bus.Law. at 1100 (emphasis added and footnotes omitted). In this case Sac City did not demand a new security agreement and financing statement from the corporation, although it knew of the incorporation before Citizens filed its financing statement.

Because Sac City's financing statement was inadequate to perfect a security interest in the corporation's after-acquired personalty, Citizen's security interest prevails as to this property or its proceeds. *See* §§ 554.9301, .9312, The Code.

VI. *Did Sac City's Security Interest Cover its Losses on the Full Recourse Chattel Paper Sold it by TJC, Inc.?*

█ When the dealership was being operated as a sole proprietorship Johnson was selling most of his finance paper on car sales to General Motors Acceptance Corporation in Des Moines, but some was sold to Sac City and to Citizens. Sac City's president testified the bank had been buying chattel paper from Johnson before its security agreement was consummated. Sac City held a separate reserve account "to be used to offset contracts that might go into default."

After TJC, Inc., acquired the dealership it sold consumer paper to Sac City, with recourse. Promptly after the incorporation Sac City obtained an agreement from Johnson individually, guaranteeing any corporate indebtedness.

Through the dealership's dishonest practices, both banks suffered losses on consumer paper assigned by TJC, Inc. Sac City claims its loss on this paper should enhance its claim on the proceeds of the sale of TJC, Inc., assets, and that its security interest gives it priority over Citizen's claim. Sac City relies on the following "obligations" clause language from its security agreement signed by Thomas S. Johnson:

to secure the payment of entire indebtedness . . . and all liabilities and indebtedness of Debtor to Secured Party, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising.

Section 554.9204(5), The Code 1971 (now section 554.9204(3), The Code), provides:

Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment.

Although in other contexts we have limited the range of such dragnet clauses, *Freese Leasing*, 253 N.W.2d at 927, we do not reach that issue as to TJC, Inc., because, as we have concluded in division V, Sac City's security interest was not perfected as to the corporation and does not extend to corporation property not acquired from the sole proprietorship. The debtor in Sac City's security agreement is identified as "Thomas S. Johnson also known as Tommy Johnson Chev. Co.," an individual. The indebtedness of TJC, Inc., cannot be included as an obligation of the "debtor" within the obligations provision of this security agreement.

Sac City does not urge that it had a lien (in the amount of the TJC, Inc., indebtedness to it) on the proceeds in the hands of the stakeholder bank because of the personal liability of Thomas S. Johnson on the guaranty to pay corporate indebtedness.

This contingent liability was discharged in bankruptcy. Rather, Sac City insists it and Johnson intended that the security agreement cover indebtedness resulting from subsequent consumer paper transactions. This rationale ignores both the separate legal identity of TJC, Inc., and the intervening rights of Citizens through its perfected security interest covering corporate assets.

We hold Sac City's security interest did not cover its losses on the full recourse chattel paper it purchased from TJC, Inc.

VII. *Does Issue Preclusion or Equitable Estoppel Bar Citizens' Claim to the Proceeds of the Assets of TJC, Inc., Described in its Security Agreement?*

As noted in trial court's factual statement, Thomas S. Johnson and his wife Corinne filed for bankruptcy November 9, 1972. Sac City filed a claim on Johnson's promissory notes, asserting its claim was secured by its April 7, 1969, security agreement covering the inventory and accounts receivable of "Thomas S. Johnson also known as Tommy Johnson Chev. Co." The testimony indicates that there were no funds in the bankruptcy estate and that on April 28, 1978, Sac City withdrew its claim to any property other than the assets upon which it claimed a lien. The president of Citizens, who was present, made no objection. The bankruptcy judge's "Orders on Claims," entered June 5, 1978, merely approved the withdrawal of Sac City's claim. Later Sac City obtained an ex parte supplemental order stating:

> As to Claim No. 3 of Sac City State Bank, the attorney for Sac City State Bank having stated to the Court that such claim is being paid in full by the sale of the property secured to Sac City State Bank as part of its claim. The Sac City State Bank does withdraw its claim as to any other property of the bankrupt by reason of the satisfaction of his claim from the sale of the secured property.

Trial court held the four prerequisites for invoking issue preclusion were not met in this case. *See Hunter v. City of Des Moines*, 300 N.W.2d 121, 123 (Iowa 1981);

*Schneberger v. United States Fidelity and Guaranty Co.*, 213 N.W.2d 913, 917 (Iowa 1973). We agree.

Trial court, however, held Citizens could not rely on Sac City's failure to refile following the incorporation, on the basis of equitable estoppel and the sections 554.1203 and 554.1201(19) good faith requirements. Our above determinations dispose of this contention, because the section 554.9402(7) refiling requirement applies only in the name change situations where the "filed financing statement becomes seriously misleading." This was not a name change case, but a conveyance of collateral to a different legal entity. Sac City could preserve its lien as to after-acquired property only by obtaining a security agreement from TJC, Inc., and filing a financing statement.

To proceed further, however, the elements of equitable estoppel set out in *Manson State Bank v. Diamond*, 227 N.W.2d 195, 201 (Iowa 1975), were not established here by the necessary quantum of clear, convincing and satisfactory proof. That Citizens knew of Sac City's unperfected security interest is irrelevant in the ultimate determination of a priority dispute. *See* 35B Iowa Code Ann. § 554.9312, Official Comment (4), Example (2) at 453 (West 1967) ("Whichever secured party first perfects his interest . . . takes priority and it makes no difference whether or not he knows of the other interest at the time he perfects his own."). Nor is it controlling that Citizens, before this matter went to litigation, thought Sac City had the first lien. There is no indication Citizens sought or had legal advice, and no evidence that Sac City changed position as a result of Citizens' ignorance of the legal consequences of the operative facts.

We hold that neither issue preclusion nor equitable estoppel prevents Citizens from establishing its lien priority on the after-acquired assets of TJC, Inc.

VIII. *Was Citizens Rightly Awarded the GM "Holdbacks"?*

Sac City, counterclaiming in this action, alleged that it was entitled to $72,-

582.51 that GM paid Citizens as "holdbacks" due to TJC, Inc. Under the dealership contract TJC, Inc., purchased cars from GM and paid the "dealer" price plus a two percent holdback amount. The contract provided that all holdback amounts were to be paid or credited to the dealer periodically, after deducting any sums due from the dealer to GM. Citizens' 1973 security agreement signed by TJC, Inc., covered, *inter alia*, accounts receivable and "dealer holdbacks." Its 1977 security agreement with the corporation included accounts, general intangibles, and contract rights.

Sac City contends its security agreement with Thomas S. Johnson covered "accounts receivable," thus it had a prior lien on the sum due from GM to TJC, Inc.

Citizens first asserts that Sac City's security agreement was with Johnson, not TJC, Inc., and therefore any amounts owing the corporation pursuant to its dealership contract with GM would not be covered by Sac City's security agreement.

Citizens further argues that the holdback amounts could not be classified as an "account." Although section 554.9106 has been amended, the basic definition of account throughout this relevant period has been "a right to payment for goods sold or leased or for services rendered." *See* 3 *Uniform Laws Annotated* § 9–106, at 182 (1981). The money paid to Citizens by GM was not an account receivable because TJC, Inc., had not sold or leased anything to GM or rendered any service to GM in the usual meaning of a service contract.

Either of the above grounds is sufficient to prevent Sac City from recovering on its counterclaim. As it had the burden to show that it was entitled to the holdback sum, we are not required to determine whether this fund was a "general intangible," covered by Citizens' security agreement. *See* § 554.-9106, The Code.

We affirm trial court's decree denying Sac City's counterclaim. We reverse its judgment insofar as it decrees that Sac City has a first lien on the proceeds from the sale of the assets of TJC, Inc. But because we are in equity and in order to effectuate

justice, *Local Board of Health v. Wood*, 243 N.W.2d 862, 871 (Iowa 1976); *Hansen v. Kaperonis*, 243 Iowa 1257, 1265, 55 N.W.2d 284, 288 (1952), we remand for further proceedings to provide Sac City an opportunity to prove the amount of the section 554.9306(2) "identifiable proceeds," if any, generated by the sale or liquidation of the inventory and accounts receivable covered by its security agreement, and for decree awarding it such amount, all consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.