# IN THE COURT OF APPEALS OF IOWA

No. 15-0813
Filed June 15, 2016


**JOSEPH TRUMM and SARA TRUMM,**
　　　Plaintiffs-Appellants,

**vs.**

**IOWA NATIONAL HERITAGE FOUNDATION, DUBUQUE BANK & TRUST COMPANY, as Executor of the Robert McCarthy Estate, DIVINE WORD COLLEGE, GERALD McCARTHY, Individually, and UNKNOWN PARTIES IN POSSESSION,**
　　　Defendants-Appellees.
_____

　　　Appeal from the Iowa District Court for Dubuque County, Thomas A. Bitter, Judge.


　　　Joseph and Sara Trumm appeal from the district court's ruling denying their request for specific performance of a real estate contract. **AFFIRMED.**



　　　Joseph W. Younker, Janice J. Kerkove, and Laura M. Hyer of Bradley & Riley, P.C., Iowa City, for appellants.

　　　Nicholas C. Thompson and Douglas M. Henry of Fuerste, Carew, Juergens & Sudmeier, P.C., Dubuque, for appellees Divine Word College (brief waived), and Iowa National Heritage Foundation.

　　　John T. Nemmers of Reynolds & Kenline, L.L.P., Dubuque, for Ohnward Bank & Trust (brief waived).

　　　Michael J. Coyle and Angela Wolfe Kelley of Heartland Financial USA, Inc., Dubuque, for appellee Dubuque Bank & Trust (brief waived).

　　　Heard by Danilson, C.J., and Vaitheswaran and Tabor, JJ.

**DANILSON, Chief Judge.**

Joseph (Joe) Trumm and Sara Trumm (collectively, the Trumms) appeal from the district court's ruling denying their request for specific performance of an installment real estate contract. They contend the court erred in finding Robert McCarthy—who died on February 22, 2012—did not have the capacity to execute a power of attorney on January 27, 2012, naming Joe and his mother, Mary Elizabeth (Betty) Trumm, as attorneys-in-fact. The Trumms also disagree with the court's finding that Joe did not act in good faith in entering into a February 20 installment contract for the sale of Robert's farm with Betty—two days before Robert died. Because Robert did not have the capacity to execute a power of attorney and because Joe and Betty did not act in good faith in entering into the installment contract, we affirm.

**I. Background Facts and Proceedings.**

As succinctly stated in the appellee's brief, "This case is about whether a power of attorney form was valid when signed, and if it was, whether it was proper for one attorney-in-fact to sell the principal's only significant asset to the other attorney-in-fact, her son, for token consideration."

The following facts found by the district court are fully supported by the record.

Betty is the sister of Robert McCarthy. Joe is Betty's son. Joe and Sara Trumm have been married to each other for twenty-two years. They both grew up in rural Dubuque County on their family farms. Joe has six sisters. He worked alongside his father (Robert Trumm) on their farm just south of Cascade, Iowa, in rural Dubuque County. Joe's paternal grandfather purchased that farm

in 1939. As a youngster, Joe drove tractors, helped with field-work, and worked extensively with the hogs. Their farm produced approximately 1000 hogs per year.

When Joe was a sophomore in high school in 1986, his father had his first heart attack. At that time, Joe took on an even greater share of the responsibility on the farm. Joe's father died in June 2012. Joe still operates the Trumm family farm, which now produces primarily beef cows, although they grow crops to feed their livestock, custom feed other's cattle, and sell seed corn on a small scale.

Joe and Sara have eight children of their own (ages two to twenty-one). The two oldest children are students at Iowa State University studying agricultural studies and plan to come back home to farm. Joe's mother, Betty, grew up on a farm not too far from the Trumm family farm.

Betty has two brothers, Robert McCarthy and Gerald McCarthy. The McCarthy family farm consisted of about 300 acres. When Betty's father died, he left the 300 acres to his wife in a life estate. When Betty's mother died in 1981 or 1982, the McCarthy family farm passed in equal thirds to Robert, Gerald, and Betty, who each received a separate parcel consisting of approximately 100 acres. Betty has always rented out her 100 acres. Starting sometime in the mid-1990's, she started renting it to Joe. Joe still rents his mother's 100 acres, which lies immediately adjacent to Robert's 100 acres. Robert farmed his own 100 acres for some period of time. Robert also had external sources of income, working as a commercial pilot and later driving a tour bus.

Betty and her two brothers did not have a close relationship for significant periods of time. Neither Gerald nor Robert ever married, and neither had any

children. Gerald became a severe alcoholic. His relationship with both Betty and Robert was very strained. Robert was intelligent, private, and concerned about conservation, but not very social. Growing up, Joe admits that he did not see Robert or Gerald very often, or know either man very well. The family dynamic was strained and neither uncle came to family functions.

Robert eventually started renting out his 100 acres (rather than farming it himself). Sometime around 2003, Joe was working at Betty's 100 acres, which he was renting from his mother at the time. Joe saw his uncle, Robert, on Robert's land. The two approached the fence-line and shook hands—"more like neighbors than relatives." They spoke, and Joe indicated that he would be interested in renting Robert's 100 acres, which Joe did beginning around 2004. Joe and Robert never had a written lease agreement. Joe paid Robert rent of $200 per acre.

Because he had strong feelings about preserving the land, Robert had strict restrictions for the use of his land. He would not allow anhydrous ammonia, fertilizers, or insecticides. Joe honored Robert's wishes, resulting in lower yields at harvest time. In the spring of 2011, Robert recognized that the yield was significantly less on his land, and he allowed Joe to begin using commercial fertilizers. Joe paid for soil samples to be taken to analyze the soil. Joe also paid $20,000 for fertilizer that year. As a result, Robert agreed to take something less for rent that year. (Joe estimates that Robert reduced the rent by a total of $2000 that year.)

About a year after Joe started renting Robert's ground, Robert started coming to more family functions, such as holidays and birthdays. Robert also

started going to his 100 acres to help Joe and Joe's sons farm the ground. He would meet them there during the planting season, and he would meet them there during harvest time. He would drive a tractor and do other things to help with the operation. As Joe's boys got older and could do more, Robert started doing less. But he still came and watched and talked with Joe and the boys.

A portion of Gerald's 100 acres was separated by the path of Highway 151. The northwest corner of the parcel consisted of approximately seventeen acres. The remaining portion sitting south of Highway 151 consisted of approximately eighty-three acres. Gerald eventually resided in a locked-down Veteran's facility in Marshalltown, Iowa, and he remained there at the time of trial. Gerald's assets are held in a conservatorship for his benefit. He pays approximately $8000 per month to stay at the Veteran's facility in Marshalltown.

In spring 2010, because Gerald's conservatorship account needed the funds, the seventeen-acre parcel was auctioned. Joe and Robert discussed the auction and wanted to buy the parcel together.[1] They attended the auction, and Joe did the bidding. The parcel eventually sold for $142,000 ($8400) per acre to the Ruth Rea, who was related to Robert. Joe says Robert was very upset that the parcel was sold outside the "family." Not long after, the remaining eighty-three acres of Gerald's land was sold privately to Molly Ball, who is also a relative of Robert. That land sold for slightly more than the appraised value. Joe says Robert was angry that the eighty-three-acre parcel was sold "outside the family" and without notice to him.

---

[1] Joe testified that he could not finance the purchase, but Robert intended to buy the parcel and Joe would work it.

On or about September 13, 2010, Robert met with Attorney Todd Locher to do some estate planning. Robert had previously consulted Locher to pursue guardianship and/or conservatorship for Gerald. Locher drafted a will for Robert, and he mailed the will to Robert almost immediately. On January 5, 2011, Locher met with Robert again to discuss the will, which was executed on January 19, 2011. The January 2011 will left Robert's 100 acres in trust for the benefit of Gerald during Gerald's lifetime. And upon Gerald's death, the land would pass to the Iowa Natural Heritage Foundation "to preserve it in its natural state for park or recreational use." On June 14, 2011, Robert executed a new will with Attorney Locher. Under the June will, instead of Joe Trumm getting all the household goods, tools, farm implements and equipment, Joe was to receive the tools, farm implements and equipment, and Betty would get the household goods.

According to Joe, Robert stopped at his home unannounced in mid-to-late August 2011. Robert said he had "changed his mind" and wanted to keep his farm in the family. Joe says Robert made it clear that the "family" meant the Joe and Sara Trumm family. Robert did not give any further details about his statement. He did not explain if he planned to change his will. Nor did he describe any gifting plans. Betty also stated Robert stopped at her home in August 2011 and said he had changed his mind and he wanted his farm to stay in the family and be farmed by Joe and Sara.

Robert did not go back to see Attorney Locher to change his will or to undertake any sort of gifting process. Robert, however, did meet with Attorney Locher on November 14, 2011, because Robert had been charged with operating while intoxicated (OWI). Locher and Robert met again briefly on January 5,

2012, so Robert could sign the written arraignment for the OWI charge. At those two visits, Robert said nothing about changing his will, gifting his farm, or anything else about the disposition of his farm.

Robert's health was declining in late 2011. He attended a December gathering with the Trumms at Joe's home. Joe admits that Robert was more tired and less talkative. However, he says Robert drove himself to and from the gathering, and he was competent. Robert was at the hospital a couple of times late in 2011, leaving against medical advice at least twice.

Robert was again hospitalized in January 2012, and he again threatened to leave against medical advice. At the request of his physician, Dr. Stille, Robert was seen by Dr. Yasyn Lee, a psychiatrist. Dr. Lee has practiced at Medical Associates in Dubuque for twenty-two years, and specializes in geriatric psychiatry. Dr. Lee first saw Robert on January 17, 2012, for approximately forty-five minutes. Robert was clearly suffering from dementia. He denied ever having any heart problems, even though he had previously had a defibrillator implanted. His verbal abilities were superficially intact, but his executive functioning was "poor" and "impulsive." Dr. Lee determined that he could not live independently, but rather needed around-the-clock supervision for his own safety. Dr. Lee began the involuntary commitment process in order to prevent Robert from leaving.

Around that same time, Betty and Joe contacted Attorney Jeannette Voss about trying to get a guardianship/conservatorship established for Robert. Attorney Voss called Attorney Locher on January 25, 2012, and advised Attorney Locher that Robert's mental health status was an issue. Attorney Locher drafted

durable power-of-attorney (POA) and medical POA documents and went to the hospital on January 27 to meet with Robert. Attorney Locher believed that he was drafting POA documents for Robert so that Joe and Betty could get Robert into a nursing home and pay Robert's bills. At the January 27 meeting, Locher asked if Robert wanted Joe and Betty to be able to help him and take care of his bills, Robert indicated he did. Robert signed the POA documents on January 27, and Attorney Locher notarized his signature. No one mentioned to Attorney Locher anything about transferring or selling Robert's land.

On January 30, 2012, Joe and Betty had Robert admitted to the memory care/Alzheimer's unit of a nursing home, Luther Manor.

On January 31, Attorney Locher met with Joe and Betty at Locher's office. Locher made notes about things like stopping at Robert's home to get his mail, paying Robert's bills, and going to Dubuque Bank & Trust (DB&T) to "cut off Robert's ability to write new checks." Those were all things Joe and Betty discussed doing with the new POA. They discussed Robert's diagnoses of dementia, congestive heart failure, and kidney failure. They discussed the person who had historically prepared Robert's income tax returns. They also discussed the fact that Robert's income (from renting the land to Joe), Robert's savings, and Robert's monthly social security would be sufficient to pay for his stay at Luther Manor for approximately a year. They did not discuss anything about selling or conveying Robert's land.

While Joe was paying Robert's bills in early February 2012, he came across a copy of Robert's will and read it. In reading the will, Joe learned that

Robert had named DB&T as executor and that Robert's property had not been left to Joe.

According to Joe, when Joe visited Robert at Luther Manor, Robert expressed concern about the cost of the facility. He told Joe that Luther Manor would get his farm. Joe testified Robert offered to give him the land. Joe said he could not do that. Robert then said he would sell it to Joe for $1, Joe again said he could not do that. Joe says the two of them continued to discuss the farm and Robert's plan to keep the farm in the family. Per Joe, between Robert and Joe, they devised a plan whereby Robert would sell the farm to Joe on contract. The monthly contract payments to Robert would be $4000, which would be enough to pay for Robert's stay at Luther Manor. Those payments would discontinue upon Robert's death. The contract would require Joe to pay $12,000 per year to Gerald for so long as Gerald lived.[2] The contract called for a maximum of $600,000 to be paid by Joe. Joe admits that he never expected to pay $600,000 for Robert's 100 acres. (A 2012 appraisal found the fair market value of the land was $970,000. In 2013, the fair market value of the land was about $940,000.)

Joe contacted Attorney Angela Railsback, an attorney in Cedar Rapids who Joe had used before. At Joe's request, she drafted an installment sale contract (using an ISBA form). The terms were consistent with the terms noted above, except that the maximum payment was $400,000—not $600,000. Joe delivered a copy of that contract to Attorney Locher's office on February 15, 2012, and he left a note asking Locher to call him.

---

[2] Joe had been paying $20,000 per year in rent to Robert. In 2013, Joe paid the executor $56,000 to rent the 100 acres. In 2014, the land was rented to another for $43,600.

Attorney Locher admits that he reviewed the contract, and he felt it "was a terrible deal" for Robert. He also felt it was a "red flag." Locher did not contact Joe about the contract, nor did he attempt to speak with Robert about the contract. Joe attempted to reach Locher on a couple of occasions over the next few days, but with no luck.

On Saturday, February 18, 2012, Joe and Sara left on a planned vacation to Hawaii.

On Monday, February 20, Joe's father contacted Attorney Locher, saying Robert was gravely ill and had hours to live. Joe's father asked if there was any way to get the contract signed immediately. Robert Trumm went on to say that Joe had been "screwed out of one farm, and he wasn't going to get screwed out of another." That same morning at 4:00 a.m. Hawaii time (8:00 a.m. Iowa time), Robert Trumm called Joe in Hawaii saying Robert McCarthy had had a bad night, Robert was at risk for a stroke, and the contract needed to be signed right away. The contract was sent to Joe electronically in Hawaii. Joe found a notary, signed the contract, and sent it back electronically to his parents. Betty, as POA for Robert, then signed the contract. The contract was never shown to Robert— before or after it was signed.

Robert McCarthy died on February 22, 2012.

On February 23, 2012, Attorney Locher received a call from the Dubuque County Recorder's Office. Betty was there trying to record the POA Locher had drafted. (Joe was still in Hawaii. Betty got a ride to the recorder's office from Joe's twenty-one-year-old son.) The recorder's office needed a cover sheet in order to record the POA. Locher, however, refused to give a cover sheet. He

presumed that Betty was trying to record the POA because it would be required for a contract that was signed by an attorney-in-fact. (Joe's son admits that he and Betty "went to Dubuque to record the contract.") Locher immediately called Attorney Railsback to determine whether a contract had, in fact, been signed.

A few weeks after Robert died, Joe took the signed contract to Tony Portz at DB&T. Joe was offering to make a payment pursuant to the installment contract for Robert's land. Portz said he could not accept any payment, but he recommended that Joe have the contract recorded. Joe says he was unable to record the contract because he did not have the necessary groundwater-hazard or declaration-of-value statements.

In May or June, Robert's will was admitted to probate with DB&T as executor. Under the June 2011 will, the land is held in trust for Robert's brother, Gerald McCarthy, during his lifetime and then distributed to Iowa Natural Heritage Foundation (Foundation), with any undistributed income going to Divine Word College.

The estate published notice to creditors and served notice on the Trumms by mail. After receiving notice, the Trumms contacted DB&T to discuss the contract for sale of the Robert's farm. DB&T refused to recognize the contract. The Trumms ultimately filed this lawsuit, seeking specific performance of a real estate contract, a declaratory judgment on the parties' rights to the real estate, and damages based on unjust enrichment and quantum meruit. The defendants, DB&T, Foundation, and Divine Word College answered and demanded a jury trial.

The jury demand was waived and a trial to the court was held on November 4 through 7, 2014. The court entered judgment on January 19, 2015. The court concluded Robert McCarthy did not have the capacity to execute the durable POA on January 27, 2012, and thus the real estate contract signed by Betty on February 20 was invalid and unenforceable.

In the alternative, the court determined that even if the POA was valid, Joe and Betty, as attorneys-in-fact, had a fiduciary relationship with Robert, and that they did not act in good faith in "frantically execut[ing] the contract in the waning hours of Robert's life." The court noted the POA did not permit Joe or Betty to make gifts of property to themselves and the terms of the real estate contract were "extremely beneficial to Joe" and for "significantly less than fair market value for the land." The court stated, "A fiduciary cannot avoid the technical meaning of a gift by transferring property to himself in exchange for token consideration." Consequently, the court rejected the claim for specific performance.

Joe and Sara Trumm now appeal. The Foundation has filed a brief defending the court's ruling.[3]

## II. Scope and Standard of Review.

The parties disagree about our standard of review. The Trumms contend the matter was an equitable action and, thus, our review is de novo. The Foundation asserts the action was filed as a law action and tried as a law action.

---

[3] The remaining defendants—DB&T, Divine Word College, and Ohnward Bank & Trust—waived the filing of briefs in support.

After oral arguments, Ohnward Bank & Trust filed a motion to be removed as a party, asserting the conservatorship had been terminated. We grant the motion.

Our review of a law action is for errors of law, and the trial court's findings are binding upon us if supported by substantial evidence. *See* Iowa Rs. App. P. 6.907, .904(3)(a); *see also NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 465 (Iowa 2010).

> "To determine the proper standard of review, we consider the 'pleadings, relief sought, and nature of the case [to] determine whether a declaratory judgment action is legal or equitable.'" [*Estate of Passehl v. Passehl*, 712 N.W.2d 408, 414 (Iowa 2006)] (quoting *Nelson v. Agro Globe Eng'g, Inc.*, 578 N.W.2d 659, 661 (Iowa 1998)). "Where there is uncertainty, a litmus test we have applied is whether evidentiary objections were ruled on by trial court." *Citizens Sav. Bank v. Sac City State Bank*, 315 N.W.2d 20, 24 (Iowa 1982); *accord Passehl*, 712 N.W.2d at 414. If so, the action is one in law. *Passehl*, 712 N.W.2d at 414 n. 6; *Stanley v. Fitzgerald*, 580 N.W.2d 742, 744 (Iowa 1998). Another indication that the action is a legal one is the parties' filing of motions normally made in legal actions. *See Citizens Sav. Bank*, 315 N.W.2d at 24. Further, a trial court generally issues a "decree" in an equitable action and a "judgment" in a legal action. *See id.*
>
> . . . .
>
> "Generally, an action on contract is treated as one at law." *Atlantic Veneer Corp. v. Sears*, 232 N.W.2d 499, 502 (Iowa 1975). Where the basic rights of the parties derive from the nonperformance of a contract, where the remedy is monetary, and where the damages are "full and certain, remedies are usually provided by actions at law, and equity has no jurisdiction." *Berry Seed Co. v. Hutchings*, 74 N.W.2d 233, 237 (Iowa 1956). "If . . . both legal relief and equitable relief are demanded, the action is ordinarily classified according to what appears to be its primary purpose or its controlling issue." *Mosebach v. Blythe*, 282 N.W.2d 755, 758 (Iowa Ct. App. 1979).

*Van Sloun v. Agans Bros.*, 778 N.W.2d 174, 178–79 (Iowa 2010).

Here, we note that a jury trial was requested (though later waived), the court ruled on objections, and the court entered a judgment rather than a decree. These are indications that the matter was tried as an action at law, but here the petition sought specific performance of a contract not damages.

Actions for specific performance of a contract are matters of equity. We review equitable matters de novo. Iowa R. App. P. 6.907. While we give weight to the factual findings of the district court, we are not bound by them. Iowa R. App. P. 6.904(3)(g). The burden of proof when the relief requested is specific performance is clear, satisfactory, and convincing. *McCarter v. Uban*, 166 N.W.2d 910, 912 (Iowa 1969). Accordingly we will undergo a de novo review.

**III. Discussion.**

We note that the POA was executed on January 27, 2012, prior to the adoption of the Iowa Uniform Power of Attorney Act, Iowa Code chapter 633B. 2014 Iowa Acts, ch. 1078. The validity of the POA prior to July 1, 2014, "is valid if the execution of the power of attorney complied with the law of this state as it existed at the time of the execution." Iowa Code § 633B.106(2) (2015).

**A. Capacity to Contract.** The Trumms argue that Robert possessed sufficient capacity to understand and comprehend his actions when he signed the POA, and therefore, the district court erred in finding otherwise.

A POA is a contract. *See Farwell v. Carpenter*, 142 N.W. 227, 230 (Iowa 1913); *see also Antomori v. Espey*, No. 07-2089, 2009 WL 1677113, at *3 (Iowa Ct. App. June 17, 2009) ("We conclude further discussion is warranted only as to the validity of the power of attorney, the contract upon which Mary Ann relies . . . ."). "The first essential element of a contract is that the parties have the capacity to contract." *Magnusson Agency v. Pub. Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 25 (Iowa 1997).

"A contract cannot be set aside on the ground of a person's incompetency to enter it unless the evidence shows the person lacked sufficient mental

capacity to understand it." *In re Guardianship of Collins*, 327 N.W.2d 230, 233 (Iowa 1982). With respect to the capacity to contract, our supreme court quoted this language from a treatise:

> Where one of the parties, for any reason, is incapable of understanding the force and effect of the alleged agreement, there is no contract; but mere mental weakness falling short of such incapacity will not invalidate a contact.
> It is essential to the validity of a contract that the parties thereto possess not only the legal status affording capacity to contract, . . . but also the mental competence affording capacity to consent. The rule which has been said to be well stated in Corpus Juris Secundum is that to make a valid contract, each party must be of sufficient mental capacity to appreciate the effect of what he is doing, and must also be able to exercise his will with reference thereto.

*In re Estate of Faris*, 159 N.W.2d 417, 420 (Iowa 1968) (internal quotation marks and citation omitted).

The question then is whether Robert McCarthy, on January 27, 2012, had "sufficient mental capacity to appreciate the effect of what he is doing." *Id.*; *see also Daughton v. Parson*, 423 N.W.2d 894, 896–97 (Iowa Ct. App. 1988) (finding clear evidence the grantor "did not possess sufficient consciousness or mentality to understand the import of her acts when the deeds were executed"); *cf. Peoples Bank & Trust Co. of Cedar Rapids v. Lala*, 392 N.W.2d 179, 184 (Iowa Ct. App. 1986) (rejecting challenge to contracting capacity). Upon our de novo review, we find Robert did not have the capacity to execute the durable POA.

The Trumms note that Attorney Locher allowed Robert to sign both the general and medical POA forms. However, Locher also testified Robert had been charged with OWI in November, which was out of character, and Locher was aware that Robert's mental capacity was in question. He testified about a

telephone call from another attorney, as well as a conversation with Joe Trumm (sometime between January 25 and January 27).

> Q. What do you remember of that conversation?  A. Joe told me that—that Mr. McCarthy was having some—I know mental health issues was mentioned to me at that time, and that he was in the hospital, but the hospital wanted to release him but he wasn't fit to return home, and that he needed to have power of attorney in order to get him admitted to a nursing home when he was released from the hospital, and that was my recollection is the main substance of that conversation.
> Q. So what, if anything, did you do then?  A. I did prepare the power of attorney document that was eventually signed on January 27, 2012.
> . . . .
> Q. And your goal is to expedite that handling [to get Robert into a nursing home]?  A. It is.  I mean, I understand the urgency of that situation, and if Mr. McCarthy isn't able to sign legal documents that allow that to happen, an involuntary conservatorship matter or guardianship matter is going to take a fair amount of time and, you know it leaves him in a state of limbo potentially.

Attorney Locher stated the purpose of the POA was to gain admission for Robert to a nursing home or long-term care facility and then to handle Robert's bills, and that when he discussed the POA documents with Robert on January 27, Robert's affect was flat, as if he was sedated.  He asked Robert "if he wanted to sign a legal document that would allow Betty Trumm and Joe Trumm to assist him with his finances, specifically mentioned, like, paying bills and writing checks."  Again, "whether he was willing to appoint Joe Trumm and Betty Trumm as agents for him to handle his finances, writing checks and paying bills."  Robert indicated "yes," and signed the documents.  Robert did not read them.  Although Locher met with Robert outside the presence of family members, our record suggests that Locher at that time was unaware of Robert's mental condition, or

that Robert was under the care of a psychiatrist and subject to a mental-health-commitment order.[4]

The Foundation sets out a helpful timeline of Robert's health after the execution of his will in June 2010:

On July 27, 2011, Robert stopped by his physician's office and was somewhat confused, stating that he was missing about half of his medications and did not know what happened to them. The pharmacy Robert used was called, and it was reported by the pharmacist that he had been coming in and requesting medications that had recently been filled, but Robert would not know what happened to them. Dr. Stille, Robert's physician, had a call placed to the Department of Human Services regarding this behavior.

On July 29, 2011, Robert saw Dr. Stille and admitted to having a memory problem. Robert reported that he did not have any family members to check up on him. Robert agreed to undergo neuropsychological testing.

On August 5, 2011, Robert presented to Dr. Chad Tracy at University of Iowa Hospitals & Clinics in Iowa City. Robert did not know why he was there and could not provide an accurate medical history.

On August 20, 2011, Robert called his physician's office, angry that he received a letter from psychiatry notifying him of his appointment for testing, despite having agreed to undergo testing at his July 29, 2011 appointment with Dr. Stille.

---

[4] Although the record is not particularly clear, we assume this is an order pursuant to Iowa Code chapter 229.

On August 21, 2011, Robert was evaluated by Dr. Caylor. Robert reported that no one cares about him. Robert had problems with attention and calculation, and he could not identify the date. Robert's recall was essentially zero.

On August 29, 2011, Robert presented to Dr. Stille, claiming he was never informed he was to undergo neuropsychological testing and refusing to do so. Aricept, a medication used to treat Alzheimer's dementia, was prescribed.

On September 30, 2011, Robert was seen by a neurologist, Dr. Horowitz, who made a diagnosis of Alzheimer's disease. On October 6, 2011, Robert was admitted to Mercy Hospital with a red and swollen right lower leg and was diagnosed with deep vein thrombosis. Robert left against medical advice on October 10, 2011.

On January 17, 2012, Robert was admitted to Mercy Hospital after his dementia prevented him from undergoing a scheduled coronary angiogram, which had resulted in Robert leaving against medical advice. Robert was referred to a psychiatrist, Dr. Lee, for further evaluation. Dr. Lee testified that Robert did not have broad decisional capacity at the time of her initial consultation on January 17, 2012. Dr. Lee diagnosed Robert with dementia of moderate severity and behavioral disturbance. In connection with her consultation with Robert, Dr. Lee had a long conversation with Betty in which Betty said she was concerned with Robert's memory and his function, and she was worried about him living alone. Betty had been looking into assisted-living facilities because Robert was not caring for himself adequately. He no longer remembered where his brother lived. Betty said Robert was not taking his

medications correctly even though they were dispensed in a medicine box. Through the course of this conversation with Betty, Dr. Lee learned that Robert's confusion was not just something that was occurring in the hospital, but something that had gone on for some months.

As of January 17, 2012, Dr. Lee's conclusion was that Robert required twenty-four-hour supervision, he could not take medications on his own, he had poor judgment, he was often disoriented, and he knew who he was, but little else. Robert did not understand that he was in a hospital, and he did not understand why he was in a hospital.

Dr. Lee continued to treat Robert until January 27, 2012. Dr. Lee had to obtain an emergency hospitalization and involuntary commitment order to treat Robert since he tried to leave, despite suffering from kidney and heart failure. Although his condition stabilized, there was not much improvement in terms of Robert's memory, and no improvement in his judgment. Dr. Lee testified that Robert did not have the ability to understand financial matters, property matters, or a contract because his executive function—which encompasses reasoning, planning and anticipating outcomes—was poor. Dr. Lee could see no evidence that Robert was able to plan or problem solve, and he was impulsive. Robert did not have the capacity to contract on January 27, 2012.

**B. Duty to Act in Good Faith.** In any event, we find that Joe and Betty did not act in good faith when they executed the real estate contract purporting to sell Robert's 100 acres to Joe.

As Robert's attorneys-in-fact under the durable POA, Joe and Betty were in a fiduciary and confidential relationship with Robert.[5] *See Mendenhall v. Judy*, 671 N.W.2d 452, 460 (Iowa 2003). They were required to act in "utmost good faith" in their dealings with Robert and his assets over which they took control. *See City of Ottumwa v. Poole*, 687 N.W.2d 266, 269–70 (Iowa 2004) (noting that contracts between parties in a fiduciary or confidential relation "requir[e] the utmost good faith and full and fair disclosure" (quoting Restatement (Second) of Contracts § 161 cmt. f)).

> "The established rule is that a power of attorney must be strictly construed and the instrument will be held to grant only those powers which are specified." Because the power of attorney form used . . . did not expressly grant [attorney-in-fact] the power to make a gift, she did not have that power.

*In re Estate of Crabtree*, 550 N.W.2d 168, 170 (Iowa 1996) (citations omitted). Further, where a confidential relationship is found to exist, and inter vivos conveyances are challenged, the burden of proof shifts to the benefited party to prove by clear, satisfactory, and convincing evidence "that the grantee acted in good faith throughout the transaction and the grantor acted freely, intelligently, and voluntarily." *Jackson v. Schrader*, 676 N.W.2d 599, 604 (Iowa 2003).

Joe testified that the sales contract was negotiated with Robert in the first days after Robert entered Luther Manor and at Robert's insistence.

---

[5] In *Vos v. Farm Bureau Life Ins. Co.*, 667 N.W.2d 36, 52 (Iowa 2003), the court wrote:
> A fiduciary relationship exists between two persons "when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Kurth v. Van Horn*, 380 N.W.2d 693, 695 (Iowa 1986) (quoting Restatement (Second) of Torts § 874 comment *a,* at 300 (1979)). Some relationships, such as those between an attorney and client, guardian and ward, principal and agent, and executor and heir, "necessarily give rise to a fiduciary relationship." *Id.* at 696.

As early as the summer of 2011, Robert was forgetting some of his medical appointments. According to Dr. Lee, Robert had mild to moderate dementia in August 2011. In early 2012, Dr. Lee talked to Betty Trumm. Betty said she was concerned about Robert's memory and functioning. She said his housekeeping was very poor, and she was looking into assistant living options. Betty said that Robert had stopped taking his medications and had forgotten where his brother (Gerald) lives. Betty clearly knew that Robert's memory was failing. She had significant discussions with his physicians. Robert was in the memory care unit at Luther Manor. Betty signed his hospice forms on February 16, 2012, and hospice was informed that the family requests "comfort care at this time." Betty was also present when Robert received his last rights from a priest. Dr. Lee does not believe that Robert had the ability to understand financial or property matters in February 2012.

Joe testified that "[t]here were certainly points during that time period [January 17 to 30, 2012,] where I would know [Robert] was not capable of negotiating contract terms." On the date Robert was admitted to the memory unit of Luther Manor, January 30, his medical records indicate he was not oriented to place or time and his decision-making was impaired. The next several days of medical records indicate Robert was not functioning well mentally and was not oriented to time or place. On February 2, he was chanting repetitively. On February 5, the records indicate both his long-term and short-term memory were impaired. These are the dates between which Joe contends he and Robert negotiated the installment sales contract for Robert's farm. During this time period, Joe was Robert's attorney-in-fact under the POA.

At 11 p.m. on February 5, Robert was taken to the emergency room and admitted to the hospital, where he stayed until February 16, when he started to receive hospice care. Betty signed him into hospice because Robert was terminal and was "unable to sign lacking cognition." Robert received last rights from a priest who was a relative. Yet, Joe testified he thought Robert might live for another five years, and that on February 18, he and Robert talked about the sales contract.

Other than the installment sale contract, no writing exists to suggest that Robert had changed his mind with respect to the disposition of his farm contained in his June 2011 will. Joe admits that he "only had Robert's word that he changed his mind." Joe's fifteen-year-old son, David, was closer to Robert than the other boys. David says he never heard Robert say that the farm would go to the Trumm family, but Robert implied it by teaching the Trumms about his ground.

Betty admits that she never spoke with Robert about the terms of the contract, saying, "I didn't have to because I was his power of attorney." She also said, "It's what he (Robert) would have wanted me to do."

Because of Robert's mental incapacity, the disadvantageous terms of the sales contract to Robert, Joe's awareness of the terms of Robert's will, and the fact that the price on the contract was below market value, and further, that Joe knew he would never have to pay the price stated—and considering any burden of proof or standard of review—we find no reason to disturb the trial court's alternative ruling that the real estate contract was unenforceable.

**AFFIRMED.**